[No. 48502–0.   En Banc.   June 9, 1983.]

BARRY CONNOR, ET AL, *Petitioners*, v. SKAGIT CORPORATION, ET AL, *Respondents*.

*Crane, Stamper, Boese & Dunham,* by *Douglas S. Dunham,* for petitioners.

*Philip A. Talmadge* and *Robert P. Piper* (of *Karr, Tuttle, Koch, Campbell, Mawer & Morrow*), for respondents.

PEARSON, J.—Plaintiff appeals a Court of Appeals decision affirming a jury verdict for defendants in a products liability action. The most substantial issue presented is whether in a strict products liability action based on a design defect the plaintiff has the burden of proving the existence of a feasible and safer alternative product design. We hold that, where the plaintiff has based his allegation of design defect solely upon the possibility of alternative designs, the burden of proving the existence of those design alternatives falls on the plaintiff. We affirm the trial court and Court of Appeals.

Plaintiff Barry Connor brought this products liability action against manufacturers of logging equipment, defendants Skagit Corporation and Bendix Corporation. Plaintiff alleged he was injured as a result of the defective design of defendants' products. The trial resulted in a defense verdict, the Court of Appeals affirmed the trial court, and this court accepted review.

Plaintiff had more than 7 years' experience in logging in New Zealand, Canada, and the Pacific Northwest. At the time of the accident, he had been employed by Hammer

Logging Company for about 6 weeks. On September 13, 1974, the day of the accident, Hammer Logging was removing felled logs from the woods using a T–90 logging tower and a Bu–80 yarder manufactured by defendants.

The tower and yarder are the two major pieces of equipment used to bring felled logs to a central location ("landing") in mountainous logging areas. The tower is a metal pole 90 feet tall from which cables extend to the woods to be hooked to felled logs. Felled trees are hooked to the cables by means of lengths of wire rope known as "chokers." The yarder is the machine containing the power source and drums upon which the cables coil and uncoil as they move to and from the tower. The logs are dragged to the landing site by the cables and are unhooked from the chokers by a worker known as a "chaser." The logs are then loaded onto trucks by a mechanical shovel.

When the yarder and tower are set up on a landing, the cab of the yarder is fixed in one direction, toward the front of the equipment. The tower is positioned in front of and slightly to one side of the cab.

The cable which hauls the logs into the landing is called the "mainline." It runs from the power drum on the yarder and up to the top of the tower. A system of pulleys and swivels at the top of the tower allows the mainline to be run to the felled logs in almost any direction, except directly behind the equipment. This means that the equipment does not have to be turned around (a task taking about 3 hours) when all the logs directly in front of the equipment have been hauled up to the landing. The mainline can be run to felled logs at any angle except for an arc of about 60 degrees directly behind the cab. In this arc, the cables scrub together creating a serious danger that one will break.

In logging terminology, when the cable from the tower to felled logs in the woods is within the half circle in front of the cab, the cable is in the "square lead." When the cable is in the half circle behind the cab, the cable is in the "diamond" or "V" lead. Operating in a diamond lead is more

difficult for the operator of the yarder because he must observe the logs approaching by swiveling in his seat and looking over his shoulder. For this reason, it is common when all the logs have been removed from the square lead to turn the equipment around and set up another square lead, rather than continuing into the diamond lead. This is by no means an invariable practice, and logging in the diamond lead is not unusual.

At the time of the accident, this equipment was set up on a landing about 75 feet below the brow of a hill. Logs were being recovered in a diamond lead from a steep embankment below the landing and out of sight of the operator of the yarder until they crested the embankment. Moreover, because the logs were approaching the landing from behind the yarder, the operator was required to look back over his shoulder to see them. When they had set the chokers on the logs, the men working down the embankment in the woods blew three blasts on a whistle, signaling the yarder operator to engage the friction drive and bring the logs up to the landing. The only way the yarder operator could estimate the distance of the logs until they appeared over the bank was by estimating the length of cable coiled on the drum.

The accident occurred while plaintiff was working as a chaser on the landing. He climbed the ladder to the cab of the yarder to converse with the operator. After a brief conversation, they heard the whistles which signaled that the chokers had been set. Plaintiff said to the operator, "You better go ahead," and after 2 or 3 seconds the operator engaged the friction drive to bring in the logs. Plaintiff began to climb down from the cab, intending to get out of the way of the incoming logs. He was hit by a log which slammed against the cab as he attempted to climb down, amputating his left forearm just below the elbow. Plaintiff brought this suit alleging that the tower and yarder were defectively designed and that defendants were therefore strictly liable for his injuries. Defendants denied that the equipment was unreasonably dangerous, and argued that even if it were unreasonably dangerous, plaintiff assumed

the risk of injury. The jury returned a general verdict for defendants. Plaintiff appealed, challenging several jury instructions, and the Court of Appeals affirmed. *Connor v. Skagit Corp.*, 30 Wn. App. 725, 638 P.2d 115 (1981).

In his petition for review, plaintiff challenges only two of the jury instructions approved by the Court of Appeals: instruction 12, which set out the plaintiff's burden of proof, and instruction 14, which dealt with assumption of the risk.

Instruction 12[1] informs the jury that the plaintiff has the burden of proving three allegations in order to establish liability: first, that the equipment was by reason of a design defect dangerous beyond the reasonable expectations of users of the equipment; second, that the defective design was a proximate cause of plaintiff's injuries; and third, "that there was available to the defendants a feasible and practical alternate design which, more likely than not, would have prevented the accident which resulted in plaintiff's injuries." Plaintiff argues that this instruction increased his burden of proof by elevating the availability of feasible alternative design to an element of the cause of action. He argues that alternative design is merely one of a number of factors which the jury may consider in determining whether a product is unreasonably dangerous.

A manufacturer is liable under the theory of Restatement

---

[1]Instruction 12 reads:

"The plaintiff has the burden of proof on each of the following allegations claiming defective design on the part of the defendants:

"First, that the yarder and tower manufactured by the defendants were designed in such a manner as to expose persons working near the equipment to hazards or dangers which were greater than would be reasonably contemplated or recognized by persons working in the logging industry in western Washington and possessing the ordinary knowledge of persons so employed as to the characteristics of said equipment.

"Second, that the alleged defective design was a proximate cause of injuries sustained by the plaintiff on September 13, 1974.

"Third, that there was available to the defendants a feasible and practical alternate design which, more likely than not, would have prevented the accident which resulted in plaintiff's injuries.

"If you find that the plaintiff has not sustained his burden of proof on any one or more of these propositions, your verdict must be for the defendants."

(Second) of Torts § 402A (1965) for injuries caused by an unreasonably dangerous product. *Ulmer v. Ford Motor Co.,* 75 Wn.2d 522, 452 P.2d 729 (1969). This liability extends to a product rendered unreasonably dangerous by reason of a design defect, rather than a manufacturing defect. *Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 149, 542 P.2d 774 (1975).

The determination of whether a design is defective is made by reference to consumer expectations. We said in *Tabert* that a product is not reasonably safe (and therefore defective) if it is "unsafe to an extent beyond that which would be reasonably contemplated by the ordinary consumer." 86 Wn.2d at 154. We explained that

> In determining the reasonable expectations of the ordinary consumer, a number of factors must be considered. The relative cost of the product, the gravity of the potential harm from the claimed defect and the cost and feasibility of eliminating or minimizing the risk may be relevant in a particular case. In other instances the nature of the product or the nature of the claimed defect may make other factors relevant to the issue.

*Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d at 154.

This passage explicitly contemplates that "the cost and feasibility of eliminating or minimizing the risk" is a factor to be considered in design defect cases. But it is equally explicit that it is a factor which "may be relevant in a particular case." Instruction 12, on the other hand, required the plaintiff to prove beyond the balance of probabilities the existence of an alternative design. Plaintiff argues that the instruction is therefore inconsistent with *Tabert* and incorrectly states the law.

A majority of the Court of Appeals held that instruction 12 correctly states the law. The court concluded that by introducing a plethora of evidence to show that alternative designs were available, plaintiff assumed the burden of proving the existence of such alternatives. 30 Wn. App. at 730. Judge Ringold criticizes this reasoning in his dissent. "It is unclear to me just how Connor can increase his bur-

den of proof—the burden of persuasion—merely by going forward with evidence, plethora or not." 30 Wn. App. at 738.

We agree with the Court of Appeals that the instruction was appropriate in the present case. Our reasoning, however, differs somewhat from that of the Court of Appeals.

■■ The majority of the court below characterized two later decisions as "elaborating" upon *Tabert*. We do not agree. In our opinion, these decisions do not modify the holding in *Tabert* that the availability of alternative designs is a factor which may, not must, be considered in deciding whether a product is unreasonably dangerous. Both were appeals from summary judgment. In the first case, *Lamon v. McDonnell Douglas Corp.*, 91 Wn.2d 345, 588 P.2d 1346 (1979), we held that summary judgment was improper because a factual issue of the availability of an alternative design had been raised by an affidavit comparing defendant's product with that of another manufacturer. In *Novak v. Piggly Wiggly Puget Sound Co.*, 22 Wn. App. 407, 591 P.2d 791 (1979), the Court of Appeals affirmed a summary judgment because no evidence had been produced to show that the product was unreasonably dangerous. One of the factors noted by the court was the absence of any alternative design which would have obviated the dangers associated with the product, a BB gun.

While both these decisions consider alternative designs as relevant to the design defect issue, neither suggests that alternative design is an essential element to be proved in every case. We conclude, therefore, that the rule continues to be that the existence of an alternative, safe design is a factor which the jury may consider in determining whether a product is unreasonably dangerous. A plaintiff may, therefore, establish that a product is unreasonably dangerous by means of factors other than the existence of alternative design.

In the present case, however, plaintiff chose not to rely on such other factors. Instead, he expressly limited his allegations to the existence of alternative designs. The jury was

instructed that

> Plaintiff claims that the products, a T–90 tower and Bu 80 yarder, designed and manufactured by defendants, were not reasonably safe and therefore defective in one or more of the following respects:
> a. Design and manufacture of T–90 tower because of the failure to include stops at the top of the tower to prevent logging beyond a square lead;
> b. Design and manufacture of the Bu–80 yarder because of:
>   1. Failure to provide a counter on the drum to warn the operator when the log approached the landing area or
>   2. Failure to relocate the cab or ladder to a safer place or
>   3. Failure to allow the cab to swivel so as to allow the operator to better view incoming logs.
>
> Plaintiff claims that one or more of these acts was the proximate cause of the injuries and damages to plaintiff. Defendants deny these claims.

Instruction 11. Plaintiff neither excepted to this instruction when it was given, nor assigned error to it on this appeal. He is therefore precluded from claiming that it is erroneous. *Estate of Ryder v. Kelly–Springfield Tire Co.,* 91 Wn.2d 111, 587 P.2d 160 (1978).

Alternative design was therefore the only basis upon which plaintiff based his claim that the product was unreasonably dangerous. He cannot complain that instruction 12 precluded the jury's finding a design defect from factors other than the existence of alternative designs, because under instruction 11 no other factors were properly before the jury. Moreover, instruction 11 is quite consistent with the evidence produced by plaintiff, which focuses almost exclusively upon defendants' failure to adopt the design modifications set forth in instruction 11.

In this case, as in any action under Restatement (Second) of Torts § 402A, plaintiff had the burden of proving that the product was unreasonably dangerous. If he seeks to meet this burden by establishing only one of the several factors contemplated by *Tabert,* it follows that he must

establish that single factor beyond the balance of probabilities. In the present case, the single factor was the availability of an alternative, safer design. Plaintiff therefore had the burden of proving the availability of a safer design. Therefore, the instruction correctly stated the law.

Plaintiff's second argument is that instruction 14 misstates the law.[2] Instruction 14 provides in pertinent part that defendant has the burden of proving

> that the plaintiff unreasonably, knowingly and voluntarily placed himself in a position where the risk of being struck by a log or part of the leadline or rigging was reasonably foreseeable by an ordinary prudent person experienced in the logging industry.

In *Seattle–First Nat'l Bank v. Tabert, supra,* we formulated the defense of assumption of the risk thus:

> [A]ssumption of the risk may be a defense in a strict liability case when it consists of voluntarily and unreasonably proceeding to encounter a known danger, *i.e.,* would a reasonably prudent person continue voluntarily to use a product in the face of a known, open and obvious danger?

86 Wn.2d at 155. More recently, the Court of Appeals approved an assumption of the risk instruction which required defendant to prove:

> (1) the plaintiff actually knew and appreciated the specific defect involved, and
> (2) that actually knowing and appreciating the specific defect involved, that plaintiff voluntarily and unreasonably took his chances and exposed himself to that defect and the resulting danger . . .

*Haugen v. Minnesota Mining & Mfg. Co.,* 15 Wn. App. 379, 383, 550 P.2d 71 (1976).

Both *Tabert* and *Haugen* require plaintiff to actually

---

[2]Plaintiff also argues that instruction 14 should not have been given on the grounds that assumption of the risk does not apply in strict liability cases. He cites *Seay v. Chrysler Corp.,* 93 Wn.2d 319, 609 P.2d 1382, 9 A.L.R.4th 625 (1980). The possible ambiguity in *Seay* relied on by plaintiff was clarified by this court in *South v. A.B. Chance Co.,* 96 Wn.2d 439, 441, 635 P.2d 728 (1981). Assumption of the risk is available in products cases as a damage–reducing factor.

know of the danger to which he is exposing himself. Instruction 14, by contrast, required only that a reasonable person in the position of plaintiff would have known of the danger. The instruction, therefore, misstates the law.

■ However, the error is harmless in the present case. Assumption of the risk is a damage–reducing factor in products cases. *South v. A.B. Chance Co.*, 96 Wn.2d 439, 635 P.2d 728 (1981). Instruction 14 accurately instructed the jury of this rule.[3] The jury returned a general verdict for defendants and therefore did not reach the issue of damages. Plaintiff was therefore not prejudiced by the instruction. *Nelson v. Mueller*, 85 Wn.2d 234, 236, 533 P.2d 383 (1975).

The Court of Appeals is affirmed.

WILLIAMS, C.J., STAFFORD, BRACHTENBACH, DOLLIVER, and DIMMICK, JJ., and CUNNINGHAM, J. Pro Tem., concur.

DORE, J. (dissenting)—The majority concludes the trial court did not err in requiring the plaintiff to prove the existence of an alternative design, because the plaintiff assumed this burden by limiting his allegations to the existence of alternative designs. I cannot agree with this conclusion and dissent.

As the majority correctly notes, the determination of

---

[3]Instruction 14 states:

"The defendant has the burden of proof on each of the following claims of alleged fault on the part of the plaintiff.

"First, that the plaintiff unreasonably, knowingly and voluntarily placed himself in a position where the risk of being struck by a log or part of the leadline or rigging was reasonably foreseeable by an ordinary prudent person experienced in the logging industry.

"Second, that plaintiff so placing himself was a proximate cause of the injuries he sustained on September 13, 1974.

"If you find the defendant has sustained its burden of proof on these claims, you must determine the degree, expressed as a percentage, to which plaintiff's fault contributed to his injuries. The court will furnish you a special verdict form for this purpose. Your answers to the questions in the Special Verdict Form will furnish the basis by which the court will reduce the amount of any damages you find to have been sustained by the plaintiff, by the percentage of such contributory fault on the part of the plaintiff."

whether a design is defective is defined relative to consumer expectations. As we stated in *Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 154, 542 P.2d 774 (1975),

> In determining the reasonable expectations of the ordinary consumer, a number of factors must be considered. The *relative cost of the product,* the *gravity of the potential harm* from the claimed defect and the *cost and feasibility of eliminating or minimizing the risk* may be relevant in a particular case. In other instances the nature of the product or the nature of the claimed defect may make other factors relevant to the issue.

(Italics mine.)

It is clear, under *Tabert,* at page 154, that although the "cost and feasibility of eliminating or minimizing the risk" through alternative design is a factor to be considered, there are also other factors which may determine whether a product is "unsafe to an extent beyond that which would be reasonably contemplated by the ordinary consumer". It is easy to imagine a product whose design is so unsafe that its manufacturer would be held liable even without a showing, required under instruction 12, "that there was . . . a feasible and practical alternate design which, more likely than not, would have prevented the accident which resulted in plaintiff's injuries". Clerk's Papers, at 20.

The majority concludes, however, that it was not error to require plaintiff to prove the existence of an alternative design beyond the balance of probabilities, as the plaintiff assumed this burden by expressly limiting his allegations to the existence of alternative designs. The majority assumes the plaintiff chose not to rely on any of the other factors discussed in *Tabert.* The record simply does not support this conclusion.

The jury was instructed:

> In determining the reasonable expectations of persons who will be using or working near the equipment, you may consider the following factors:
> (a) The gravity of the potential harm from the claimed defect;
> (b) The purpose and function of the equipment

involved;

(c) The circumstances and conditions under which the equipment will normally be used;

(d) The number and experience of persons who will be using or working near the equipment when it is in operation;

(e) The manner in which plaintiff's injury occurred; and

(f) Any other factor or factors you believe reasonably bear on this issue.

Instruction 13, Clerk's Papers, at 21. These factors obviously relate to the nature of the product and the claimed defect, as allowed under *Tabert,* quoted above. The jury could easily have concluded that any of these factors, singly or in combination, made the tower and yarder unsafe beyond reasonable consumer expectations.

The majority bases its conclusion that the plaintiff expressly limited his allegations to the existence of alternative designs almost exclusively on instruction 11 which states:

Plaintiff claims that the products, a T–90 tower and Bu 80 yarder, designed and manufactured by defendants, were not reasonably safe and therefore defective in one or more of the following respects:

   a. Design and manufacture of T–90 tower because of the failure to include stops at the top of the tower to prevent logging beyond a square lead;

   b. Design and manufacture of the Bu–80 yarder because of:

      1. Failure to provide a counter on the drum to warn the operator when the log approached the landing area or

      2. Failure to relocate the cab or ladder to a safer place or

      3. Failure to allow the cab to swivel so as to allow the operator to better view incoming logs.

Plaintiff claims that one or more of these acts was the proximate cause of the injuries and damages to plaintiff. Defendants deny these claims.

Clerk's Papers, at 19.

Citing this instruction, the majority at page 716 con-

cludes "[a]lternative design was therefore the only basis upon which plaintiff based his claim that the product was unreasonably dangerous". Yet, instruction 11 clearly relates to the *nature* of the claimed design defect discussed under *Tabert,* and *not* to the feasibility of eliminating or minimizing the potential risk. Under instruction 13, *Tabert* factors other than feasibility of alternative design—for instance, the gravity of the potential harm from the claimed defect and the relative cost of the product—were to be considered by the jury.

Additionally, a review of the record indicates that factors other than feasibility of design alternatives were relied upon by the plaintiff. David MacCollum, a consulting safety engineer, testified concerning the gravity of potential harm which could result from the defective design of the yarder and tower as follows:

> My opinion that it's far from safe and that there are many hazards that—and the risks are very great, when you analyze the material that you presented me in the systems approach.
>
> . . .
>
> If the line is tight, you know, the main line and the haul line is tight, the chokers are long in length and they swing as a pendulum.
>
> So in that set of circumstances, the logs then can easily come into the cab, which is now in a danger zone.
>
> Then we say: Or, we slack off the haulback, and that causes this, then, to drop and act as a pendulum also. Or, we slack off on the main line, and that causes this, then, to pendulum effect. Or, you slack off on the throttle. And all of these "or's" then get you into a situation of where the hazard is then armed, it's then active; it swings as a pendulum into the cab.
>
> And so that's a very gross hazard, and the likelihood of it becomes very high, because there's all of these, or this, or this, or this can happen to propel the log on the end of the pendulum into the cab.
>
> . . .
>
> The next point here is, when you have to have your controls in front of you and you have to watch yourself, or contort yourself to watch what you're doing, then you

have a slower reaction time. You are next into the position of not being—having to contort yourself, so you are not in an easy position. And you have reduced the period of time, because the distance is short on that brow.

And I'd say certainly there is a lot of machine distraction, because the machine is noisy. And that's why you can't talk to the person from the ground. You have to climb that ladder to give any instructions.

So the noisy machine and the access in the danger zone brings the injured into that danger zone.

3 Report of Proceedings, at 29–35.

Dieter Jahns, an engineering psychologist, testified as follows regarding the safety of operating the tower and yarder in a diamond lead:

I think operating the equipment from that lead puts too great a demand on the operator to operate it, to haul the logs safely and efficiently with respect to the total work relationship.

5 Report of Proceedings, at 18.

At page 19, Jahns went on to relate this analogy:

Based upon not only my search but research in the general literature, the human is notoriously bad at estimating distances beyond 20 feet and also very bad at estimating speed. Operating this gear would be similar to driving your car from here [Seattle] to Vancouver without a speedometer or odometer with all the road signs gone. You'd have very little information, knowing where you were and how fast you were getting there, and you'd probably have a bunch of tickets in the process.

See also testimony of Marvin Flickner, 1 Report of Proceedings, at 30–31, 75.

The plaintiff himself testified as follows, at page 89, concerning using the equipment to log in a diamond lead:

The whole logging operation, as you can realize, is dangerous because of the horsepower and the weight and the speed, and the organization has got to be precise to do things speedily and safely.

Barry Connor went on to testify, at page 138, that he considered operating the equipment in a V–lead "very, very, very" dangerous, because "[t]he operators become so

crazed, if they keep continually doing something for so long".

Arthur Mendel, manager of marketing services for the defendant manufacturing company, testified that the equipment was sold to the logging company using it at the time of the accident for approximately $125,000 in 1973. 4 Report of Proceedings, at 10.

After reviewing the above evidence presented to the jury, I am unconvinced by the majority's statement, at page 716, that the evidence produced by the plaintiff "focuses almost exclusively upon defendants' failure to adopt the design modifications set forth in instruction 11". If the jury had not been incorrectly instructed as to the plaintiff's burden of proving the availability of an alternative, safer design, it could have found for the plaintiff on the evidence presented to it relating to other factors.

We should not characterize this error as harmless. As Judge Ringold noted in his dissenting opinion in *Connor v. Skagit Corp.*, 30 Wn. App. 725, 740, 638 P.2d 115 (1981),

> [w]e have no way of divining the specific reasons underlying the jury's verdict for the defendant. If the jury concluded that Connor met the burden of proof except for his failure to prove the existence of a design alternative as required by the erroneous instruction, then the error was prejudicial.

I am also troubled by the majority's characterization of the trial court's misstatement of the law relating to assumption of risk as "harmless" error. Majority, at 718. The jury was instructed that the defendant had the burden of proving

> that the plaintiff unreasonably knowingly and voluntarily placed himself in a position where the risk of being struck by a log or part of the leadline or rigging was reasonably foreseeable by an ordinary prudent person experienced in the logging industry.

Instruction 14, Clerk's Papers, at 22. The jury was not instructed, however, that assumption of risk operates as a damage–reducing factor rather than a complete bar to a

plaintiff in a strict liability cause of action. *South v. A.B. Chance Co.,* 96 Wn.2d 439, 635 P.2d 728 (1981). Consequently, the jury could easily have thought, under instruction 14, that plaintiff's assumption of risk meant no liability on the part of the defendant. As the trial ultimately resulted in a defense verdict, we certainly cannot conclude the error was harmless.

I would reverse and remand for a new trial.

UTTER, J., concurs with DORE, J.

Reconsideration denied August 24, 1983.