[No. 68434-1. En Banc.]
Argued February 17, 2000. Decided August 24, 2000.

CERTIFICATION FROM THE UNITED STATES

COURT OF APPEALS FOR THE NINTH CIRCUIT

IN

RICARDO RUIZ-GUZMAN, ET AL., *Appellants*, v. AMVAC CHEMICAL CORPORATION, ET AL., *Appellees*.

494

*Marcia M. Meade* (of *Dawson & Meade*); *Patti A. Goldman* (of *Earthjustice Legal Defense Fund*); and *Michael E. Withey* and *Paul L. Stritmatter* (of *Stritmatter Kessler Whelan Withey*) (*Brent M. Rosenthal* of *Trial Lawyers for Public Justice*, of counsel), for appellants.

*V.L. Woolston* (of *Perkins Coie*); and *Glenn S. Draper* and *Christopher W. Tompkins* (of *Betts, Patterson & Mines, P.S.*), for appellees.

*Emilia L. Sweeney* and *Stewart A. Estes* on behalf of Washington Defense Trial Lawyers, amicus curiae.

*Debra L. Stephens* and *Bryan P. Harnetiaux* on behalf of Washington State Trial Lawyers Association Foundation, amicus curiae.

BRIDGE, J. — Pursuant to chapter 2.60 RCW and RAP 16.16, the United States Ninth Circuit Court of Appeals has certified to us two questions involving construction of the Washington product liability act (WPLA), chapter 7.72 RCW. Those questions are:

1. Under the WPLA's "risk-utility" test, may a plaintiff rely upon an alternative product to show that the challenged product's risks outweigh the adverse effects of using an "alternative design?"

2. Under Washington law, can a pesticide be an "unavoidably unsafe product" as described in comment *k* to Restatement (Second) of Torts § 402A?

We accepted certification of the questions, and now answer both in the affirmative.

## FACTS

The parties have stipulated to certain facts from the underlying case for purposes of our review. Three of the plaintiffs, Ricardo Ruiz-Guzman, Martin Martinez, and Miguel Farias (hereinafter referred to collectively as "plaintiffs"),[1] worked for apple growers in Mattawa, Washington, in the summer of 1993. Among other things, their duties included mixing, loading, or applying certain pesticides used in their employers' orchards. Until 1993, Eastern Washington apple growers used a "restricted use" pesticide[2] called Phosphamidon to control aphid infestations in their orchards. However, Phosphamidon's manufacturer chose not to renew the pesticide's federal registration with the Environmental Protection Agency (EPA) for the 1993 growing season. In spring of that year, defendant Amvac Chemical Corporation was told by one of its distributors, defendant Wilbur-Ellis Company, that Washington apple growers wanted to identify a pesticide to replace Phosphamidon as a means of controlling aphids in their orchards. Amvac manufactured Phosdrin, which had been used to control aphid infestations in crops other than apples. Phosdrin was also

---

[1] The remaining plaintiff, Ignacia Farias, is Miguel's wife.

[2] "Restricted use" pesticides must be registered with both the Environmental Protection Agency (EPA) and the Washington State Department of Agriculture. Pesticides so classified by the EPA may be distributed only by a licensed pesticide dealer to a certified pesticide applicator or his or her duly authorized representative. *See* WAC 16-228-164.

classified by the EPA as a "restricted use" pesticide, and its label bore a federally approved warning limiting Phosdrin's permissible uses, among them application in apple orchards, and providing detailed instructions on its use.

Due to Phosdrin's toxicity, and its anticipated use by Washington apple growers unfamiliar with it, Amvac worked with the Washington State Department of Agriculture (WSDA) to develop additional restrictions on Phosdrin's sale and use in Washington orchards. WSDA adopted these restrictions, using a fast-track method, known as "Emergency Rules." The restrictions became effective on June 14, 1993. The rules included restrictions on application techniques and required that training be available for growers using Phosdrin on apples or pears.

On July 13, 1993, Farias reported symptoms after working with Phosdrin, and the next day was diagnosed at Quincy Valley Hospital with a mild toxic reaction to organophosphates. Days later, Martinez and Ruiz-Guzman separately reported symptoms after working with Phosdrin. They were admitted to Sunnyside Hospital and treated for organophosphate exposure.

The relevance and admissibility of the following facts submitted by the Ninth Circuit has not been stipulated to: that on August 30, 1993, the WSDA temporarily suspended Phosdrin's further use on Washington tree fruit orchards pending public hearings; that on June 30, 1994, Amvac requested the cancellation of Phosdrin's registration, and the EPA cancelled it; and that Phosdrin can no longer be used in the United States.

Plaintiffs originally filed suit against Amvac and Wilbur-Ellis in King County Superior Court in September 1995, and the lawsuit was removed to the United States District Court for the Eastern District of Washington. Following discovery, the district court granted summary judgment, holding, in part, that in the absence of showing an alternative formulation for Phosdrin, plaintiffs had not demonstrated a design defect under Washington law. Alternatively, the court held that Phosdrin was an unavoidably

498

unsafe product under comment *k* to Restatement (Second) of Torts § 402A. Plaintiffs appealed, and after briefing and oral argument, the Ninth Circuit, as noted above, asked this court to answer two questions. We agreed to do so, and also granted leave to two parties, the Washington Defense Trial Lawyers and the Washington State Trial Lawyers Association Foundation (WSTLA Foundation), to file amicus briefs.

## ANALYSIS

## I

The threshold question posed by the Ninth Circuit in this case is whether a plaintiff may rely upon an alternative *product*, under the risk-utility test of the WPLA, to show that a challenged product's risks outweigh the adverse effects of using an alternative *design*. Only if this question is answered in the affirmative is the Ninth Circuit's second question certified to us. Plaintiffs would have us answer the question in the affirmative, while Amvac contends that the answer is more complicated than a simple "yes" or "no."

Under the WPLA: "A product manufacturer is subject to liability . . . if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed *or* not reasonably safe because adequate warnings or instructions were not provided." RCW 7.72.030(1) (emphasis added). Plaintiffs do not dispute the adequacy of the warnings or instructions provided with the Phosdrin,[3] but rather argue that "the product was not reasonably safe as designed. . . ." *Id.*

---

[3] The parties dispute whether the plaintiffs' arguments before the district court and before the Ninth Circuit have been consistent, with Amvac contending that the plaintiffs argued inadequacy of warnings or instructions in the district court and then argued unsafe design before the Ninth Circuit. This argument is for the Ninth Circuit to resolve, and is irrelevant to the resolution of the specific questions certified to us. *See Kitsap County v. Allstate Ins. Co.*, 136 Wn.2d 567, 577, 964 P.2d 1173 (1998) ("[W]hen a federal court certifies a question to this court, this court answers only the discrete question that is certified and lacks jurisdiction to go beyond the question presented.") (citing *Louisiana-Pacific Corp. v. Asarco Inc.*, 131 Wn.2d 587, 604, 934 P.2d 685 (1997)).

Addressing this question requires the application of the risk-utility test provided for in the WPLA. Under this balancing test, a product

> is not reasonably safe as designed, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, outweighed the burden on the manufacturer to design *a* product that would have prevented those harms and the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product.

RCW 7.72.030(1)(a) (emphasis added).

Plaintiffs argue that

> [b]y using the indefinite article "a" rather than the definite article "the" to describe the product to be compared with the challenged product, the Act, read literally, permits reliance on the existence or feasibility of a product *different from the challenged product* to establish . . . that the challenged product is "not reasonably safe."

Opening Br. of Plaintiffs-Appellants at 8.

Amvac does not entirely disagree, stating that reliance upon an alternative product should be permitted "when the alternative product incorporates a design feature that the defendant could have incorporated *into the challenged product*, at the time it was manufactured, and thereby prevented the plaintiff's harm." Response Br. of Defendant-Appellee at 10-11 (emphasis added). Amvac asserts, however, that an alternative product is not feasible in this instance given that an alternative pointed to by plaintiffs, Phosphamidon, was commercially unavailable. Amvac notes that Phosphamidon's manufacturer failed to renew its EPA registration, and that even had its registration been renewed, another manufacturer would have held the exclusive rights to Phosphamidon. See Response Br. of Defendant-Appellee at 20.

We have never specifically described the proof necessary to demonstrate the existence of an adequate alternative product under RCW 7.72.030(1)(a). Indeed, both parties cite

*Lamon v. McDonnell Douglas Corp.*, 91 Wn.2d 345, 588 P.2d 1346 (1979),[4] as the only published decision where a plaintiff was allowed to demonstrate a defective design by comparing a challenged product with that of another product from a different manufacturer.

In *Lamon*, a flight attendant, Lamon, sought damages for injuries she sustained falling through an emergency exit hatch that had been left open, contrary to instructions received during training, by another attendant in an airplane galley. *Id.* at 346-47. Lamon alleged that the airplane, a DC-10, was defectively designed and manufactured, and that the manufacturer, McDonnell Douglas, had negligently failed to properly warn of a dangerous condition. *Id.* at 346. A motion for summary judgment was granted to McDonnell Douglas. *Id.* On appeal, this Court reversed. *Id.* We referred to an expert's affidavit that had been introduced before the trial court comparing the escape hatches of a DC-10 and Boeing 747, and wrote that "[t]he comparison of the two hatches in the affidavit raises the inference that a reasonable alternative which poses less risk is feasible." *Id.* at 352.

Amvac interprets this to mean that Lamon "simply used the existing 747 design to illustrate the feasibility of a 'hinged' hatch cover that could have been incorporated *into the DC-10* and would have prevented her from being harmed." Response Br. of Defendant-Appellee at 10 (emphasis added). However, this was never stated in the opinion and the plaintiffs disagree with this analysis. In support of their position they refer us to *Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 818 P.2d 1337 (1991), wherein it was alleged that a baby product was "not reasonably safe" under the WPLA because its packaging contained a warning inadequate to prevent a baby's harm. Defendants in *Ayers* had argued that plaintiffs failed to support their claim by establishing the exact wording of an

[4] Although *Lamon* predates the WPLA's enactment, it still has "continuing vitality." *Soproni v. Polygon Apartment Partners*, 137 Wn.2d 319, 329 n.5, 971 P.2d 500 (1999).

alternate warning, and that "a jury cannot decide that a warning would have prevented an accident without knowing exactly what that warning is." *Id.* at 756. We held that no such requirement under the WPLA existed, and that "requiring claimants in failure to warn cases to establish the exact wording of an alternative warning would impose too onerous a burden." *Id.*

Importing the logic of *Ayers*, the plaintiffs here argue that "it would impose 'too onerous a burden' on plaintiffs in design defect cases to show not just that other products are adequate substitutes for the defendant's product, but that the chemical composition in the defendant's product could be altered to make the product safer and just as effective." Opening Br. of Plaintiffs-Appellants at 12; *see also Soproni v. Polygon Apartment Partners*, 137 Wn.2d 319, 330, 971 P.2d 500 (1999) (chiding Court of Appeals for not engaging "in any overt balancing of the risk of Alpine's product against its utility" by concluding, in essence, "that a product is not unsafe merely because safer designs exist for a given application . . . .").[5] Plaintiffs argue in favor of a broad, rather than narrow, interpretation of the term "alternative design" as it is used in the WPLA—one including other products that perform the same function as the challenged product. Reply Br. of Plaintiffs-Appellants at 10. They assert that this would be in keeping with the fact that "a design defect product liability claim is still a strict liability claim" and "the focus is still on the reasonable safety of the product rather than on the reasonableness of the conduct of the manufacturer." *Id.* at 10 (quoting *Falk v. Keene Corp.*, 113 Wn.2d 645, 653, 782 P.2d 974 (1989)); *see also Soproni*, 137 Wn.2d at 330 (embracing this holding in *Falk*).

In *Falk*, plaintiffs alleged that companies that had manufactured asbestos were liable for a plaintiff's cancer caused as a result of exposure to that asbestos. There, we held that a trial court had erred in giving jury instructions based on

---

[5] Perhaps tellingly, Amvac makes far more of the dissent in *Soproni* than its majority. Defendant-Appellee Amvac Chemical Corporation's Resp. to the WSTLA Foundation at 5-6, 7-8.

negligence, for we found that strict liability, not ordinary negligence, was the standard adopted by the Legislature in determining manufacturer liability for defectively designed products. *Falk* further noted that the consumer expectations test in the WPLA should be considered along with its risk-utility test in a product liability case.[6] *Falk*, 113 Wn.2d at 651.

In *Couch v. Mine Safety Appliances Co.*, 107 Wn.2d 232, 728 P.2d 585, 78 A.L.R. 4th 139 (1986), we held that "the availability of an alternative, reasonably safe design is *not* a necessary element of a plaintiff's burden of proof in a product liability action based on defective design." *Id.* at 234 (emphasis added). In *Couch*, a logger was killed as a result of a head injury caused by a tree falling on him, and his wife sued the manufacturer of his safety helmet—alleging that it was not reasonably safe under the WPLA. Presented with a contrary interpretation of the WPLA, we flatly rejected the argument that a "plaintiff bears the burden of proving the existence of a practical and feasible alternative design." *Id.* at 239. This was in keeping with an earlier common law holding that "[a] plaintiff may . . . establish that a product is unreasonably dangerous by means of factors *other* than the existence of alternative design." *Connor v. Skagit Corp.*, 99 Wn.2d 709, 715, 664 P.2d 1208 (1983) (emphasis added).[7]

■ We did note in *Couch*, however, that in cases where a plaintiff seeks to prove liability through the use of only *one* factor, such as the risk-utility test instead of the consumer expectations test, that factor must be established by a preponderance of the evidence. *Couch*, 107 Wn.2d at 237 n.4 (citing *Connor*, 99 Wn.2d at 715-17). In *Connor*, for

---

[6] The consumer expectations test is as follows:

In determining whether a product was not reasonably safe under this section, the trier of fact shall consider whether the product was unsafe to an extent beyond that which would be contemplated by the ordinary consumer.

*Falk*, 113 Wn.2d at 650 (quoting RCW 7.72.030(3)).

[7] *Connor*'s holding "still prevails" under the WPLA. *Couch*, 107 Wn.2d at 239.

example, the plaintiff "chose not to rely on any factors other than the availability of an alternative, safe design in presenting his case to the jury." *Id.* Accordingly, the plaintiffs here, by relying upon the risk-utility test and not invoking the consumer expectations test, must prove the existence of an alternative design to Phosdrin. *Couch* and *Connor* demonstrate that Washington strict liability analysis is not a one-dimensional, risk-utility test that requires proof of a specific design "defect." *Baughn v. Honda Motor Co.*, 107 Wn.2d 127, 136, 727 P.2d 655 (1986) (noting that we do not "deem it necessary to apply the type of risk-utility analysis . . . that specifically requires preliminary proof of 'something wrong'.") (quoting *Perkins v. F.I.E. Corp.*, 762 F.2d 1250, 1272 (5th Cir. 1985)).

Plaintiffs would like to point to the existence of other aphid-killing pesticides such as Phosphamidon, to show that *safer* pesticides could serve the same purpose as Phosdrin. Although it is true that a competitor held the patent to Phosphamidon, and allowed its EPA registration to lapse, this could hardly mean that Amvac was free to introduce an alternative means of killing aphids with indifference to its greater risk of harming humans—simply ignoring its statutory burden "to design a product that would have prevented those harms . . . ." RCW 7.72.030(1)(a). For example, if the only means of competing with products that are safer as designed is by introducing an unreasonably unsafe design then it would obviously be far better to yield to the *safer* products. Most products, after all, do not exist in a vacuum. *Lamon*, while not directly on point, is helpful here. *Lamon* did not require that the plaintiff show that it was feasible to incorporate the Boeing 747 hatch design into the DC-10. Nor did the plaintiff's expert's affidavit quoted in *Lamon* address this. *Lamon*, 91 Wn.2d at 348-49. Comparing the two hatches simply raised the inference that a reasonable alternative to the DC-10 hatch which posed less risk was feasible. *Id.* at 352.

If another product can more safely serve the same purpose as the challenged product at a comparable cost and in

a similar manner, a jury should be able to conclude that the risks of the challenged product outweigh its utility. Persuasive authority for this position can be found in the law of products liability as stated in the new *Restatement (Third) of Torts* § 2 cmt. *f.*, at 24 (1998), which allows a plaintiff to establish an alternative safer design through "other products already available on the market [that] may serve the same or very similar function at lower risk and at comparable cost. Such products may serve as *reasonable alternatives to the product in question.*" (Emphasis added.) *See also, e.g.*, RESTATEMENT (THIRD) OF TORTS cmt. *d.*, at 19 (1998) ("How the defendant's design compares with other, competing designs in actual use is [also] relevant to the issue of whether the defendant's design is defective.").

Amvac argues that to allow admission of alternative product design without proving that the design could have been incorporated into the challenged product would be to absolve pesticide applicators for reckless or negligent decisionmaking involving the challenged pesticide. *See* Response Br. of Defendant-Appellee at 22. However, this is no truer than if Amvac's own test were met; moreover, it would not logically follow if those applicators were not provided in the first place with pesticides "not reasonably safe as designed . . . ." RCW 7.72.030(1). Indeed, Amvac errs on the side of effectively placing all responsibility for injuries caused by Phosdrin and like products upon their users, which is quite in contrast to the strict product liability regime provided for by the WPLA. There, after all, "the focus is . . . on the reasonable safety of the *product.*" *Falk,* 113 Wn.2d at 653 (emphasis added). As we have noted, "Once the product is found to be not reasonably safe . . . , the manufacturer is liable for harm proximately caused *by the design defect.*" *Id.* at 651 (emphasis added).

Our answer to the first question certified to us is that a plaintiff *may* satisfy the requirement of showing an adequate alternative design by showing that other products

can more safely serve the same function as the challenged product.[8]

## II

The second question certified to us, upon an affirmative answer to the first, asks whether, under Washington law, a pesticide *can* be an "unavoidably unsafe product" as described in comment *k* to *Restatement (Second) of Torts* § 402A.

■ Section 402A establishes strict liability for " '[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property . . . .' " *Ulmer v. Ford Motor Co.*, 75 Wn.2d 522, 530, 452 P.2d 729 (1969) (quoting approvingly *Restatement (Second) of Torts* § 402A). However, there is an exception for "unavoidably unsafe products," which reads as follows:

> There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience,

---

[8] The availability and feasibility of such alternatives to Phosdrin, the subject of debate between the parties, is a question for the Ninth Circuit, not this Court, to resolve as part of the underlying case. *Kitsap County*, 136 Wn.2d at 577. Plaintiffs suggest that the alternative design or product must be "technologically achievable and economically viable." Plaintiffs-Appellants' Br. in Answer to Brs. of Amici Curiae. We agree that this standard is in keeping with the statutory requirement that an alternative design be "practical and feasible. . . ." RCW 7.72.030(1)(a).

there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

RESTATEMENT (SECOND) OF TORTS § 402A cmt. *k* (1965). There is no debate that this exception has been expressly adopted by this court. *Terhune v. A.H. Robins Co.*, 90 Wn.2d 9, 12, 577 P.2d 975 (1978).

We should note that the comment *k* exception to strict liability was not expressly provided for by the Legislature in adopting the WPLA, although it is implicit that products that are "unavoidably unsafe" are not products that ever *could* be "reasonably safe as designed . . . ." RCW 7.72.030(1). Because comment *k* was not expressly provided for in the WPLA, we must be sparing in its application lest we defeat the letter or policy of the WPLA.

The application of comment *k* by this court has been confined to a trilogy of cases involving medical products available only through a physician. In the first case, *Terhune*, we held that the manufacturer of a contraceptive device, the Dalkon Shield, would not be liable for injuries caused by its product if adequate warnings and instructions to prescribing physicians were supplied. *Terhune*, 90 Wn.2d at 13-14. In such a case, "[w]here a product is available only on prescription or through the services of a physician, the physician acts as a 'learned intermediary' between the manufacturer or seller and the patient." *Id.* at 14. The principles of comment *k* "have their basis in the character of the medical profession and the relationship which exists between the manufacturer, the physician and the patient." *Id.* at 16.

The second case in which comment *k* was applied, *Rogers v. Miles Labs.*, 116 Wn.2d 195, 802 P.2d 1346 (1991), likewise involved a medical product. There, we were confronted with another federal certified question, one asking whether strict liability was applicable to a for-profit pharmaceutical company for injuries that allegedly resulted from the processing and supplying of HIV-contaminated blood products. *Id.* at 197. We wrote that

> [c]omment *k* justifies an exception from strict liability by focusing on the product and its *relative value to society* . . . . Some products are necessary regardless of the risks involved to the user. The alternative would be that a product, *essential to sustain the life of some individuals*, would not be available— thus resulting in a *greater harm* to the individual than that risked through use of the product. Blood and blood products fall into this category.

*Id.* at 204 (emphasis added).

The final case in this trilogy, *Young v. Key Pharmaceuticals, Inc.*, 130 Wn.2d 160, 922 P.2d 59 (1996), was one where a Court of Appeals' decision, which held that comment *k* applied to all prescription drugs, was affirmed, in the absence of a constitutional majority, by a 4-4 plurality vote.[9] The plurality adopted the Court of Appeals' decision, quoting as follows:

> "While there is language in comment k that can be read otherwise, the focus of both *Terhune* and *Rogers* is such that we conclude that . . . a separate determination of whether a product is unavoidably unsafe need not be made on a case-by-case basis if that product is a prescription drug."

*Id.* at 170 (footnote omitted) (quoting *Young v. Key Pharms., Inc.*, No. 33070-5-I, slip op. at 2-8 (Wash. Ct. App. June 19, 1995)). The Court of Appeals had also noted that " 'it is precisely because they are unavoidably unsafe to some degree that they are prescription drugs.' " *Id.* (citation omitted). The dissent agreed that "[t]he rationale underlying the exception is the recognition that certain products are incapable of being made safe for their intended and

---

[9] Justice Talmadge did not participate.

ordinary use, but the marketing of such products is justified despite the medically recognizable risk because of the *social utility* of having the product available." *Id.* at 181 (Madsen, J., dissenting) (emphasis added). The issue upon which the dispute between the *Young* plurality and dissent was centered was on the failure to warn, not on the standard to be applied in defining comment *k* products.

Both Amvac and the WSTLA Foundation agree that the plurality view in *Young* "would treat as *equal* a variety of prescription drugs that have *vastly differing* social utility," Amicus Br. of WSTLA Foundation at 17 (emphasis added), and that this is a result arguably incongruent with the social utility reasoning in *Terhune* and *Rogers*. Yet, it is not appropriate for us to use this case to accept the WSTLA Foundation's invitation to "reject the view that all prescription drugs are exempted from strict liability analysis" and exchange it for a product-by-product approach. *Id.* The determination to be made here is the application of *pesticides* as a product group to comment *k* protection. In answering federal certified questions, we do not seek to make broad statements outside of the narrow questions and record before us. *Crossler v. Hille*, 136 Wn.2d 287, 289, 961 P.2d 327 (1998).

By its own terms, comment *k* is especially applicable to medical products. The exceptions for medical products recognize the unique protection provided to the consumers of such products by the prescribing physician (and/or pharmacist) intermediary. "[I]t [is] safe to surmise that ordinarily a physician will not prescribe or utilize a product which he does not consider reasonably safe, and that he will take into account the amount of testing, or lack thereof, which has been done with respect to the product." *Terhune*, 90 Wn.2d at 16. A physician possesses the medical training to assess adverse health effects of a medical product and to tailor that assessment to a particular patient. As we noted in *Terhune*, the physician "is concerned with the total health and physical well-being of his patients . . . . Certainly the insertion of the Dalkon Shield requires a

physician's services, his knowledge and his skill. . . . [I]t is he who supplies and inserts the device." *Id.* at 15.

In contrast, it may *not* be safe to surmise that a commercial grower—as the analogous intermediary between manufacturer and ultimate user—will independently evaluate the risks of use of a particular pesticide. While it is true that a pesticide such as Phosdrin is highly regulated, not unlike a prescription drug, analogizing certified pesticide dealers and applicators to medical professionals is probably unwarranted. Moreover, the only two outside authorities that we are referred to in which the application of comment *k* to pesticides was at issue refused to apply comment *k* outside the realm of medical products. *See Arkansas-Platte & Gulf Partnership v. Dow Chem. Co.*, 886 F. Supp. 762, 767 (D. Colo. 1995); *Kennan v. Dow Chem. Co.*, 717 F. Supp. 799, 812 (M.D. Fla. 1989).

While pesticides are inherently toxic by definition, including pesticides *as a class* in comment *k* would free a pesticide manufacturer from any incentive to make its pesticides *safer* to humans because they could *never* be made "safe." Thus, human safety would be essentially irrelevant in composing the toxicity of a pesticide. Certainly, disregard for human health in the application of comment *k* would extend that comment's reach very far from our initial holding that "[t]he principles stated in comment *k* . . . . have their basis in the character of the medical profession and the relationship which exists between manufacturer, the physician and the patient." *Terhune*, 90 Wn.2d at 16. However, a determination that pesticides can *never* be unavoidably unsafe products within the ambit of comment *k* would seem to defy common sense.[10] Consistent with the social utility reasoning of

---

[10] Plaintiffs point out that the weight of comment *k* commentary addresses its applicability to medical products alone. Plaintiffs-Appellants' Br. in Answer to Brs. of Amici Curiae at 17-18. However, the comment, by its own terms, applies to all "[u]navoidably unsafe products." RESTATEMENT (SECOND) OF TORTS § 402A cmt. *k* (1965). Thus, its scope is not limited solely to the examples it provides to illustrate that such products "are *especially* common in the field of drugs." *Id.* (emphasis added).

*Rogers*, a product-by-product approach to the application of comment *k* is warranted.

■ Under this approach, not all products that cannot be made safer would qualify as "unavoidably unsafe" products entitled to comment *k*'s protection. Instead, the defendant manufacturer of a challenged product would have to demonstrate that an inherently dangerous product is also "necessary regardless of the risks involved to the user." *Rogers*, 116 Wn.2d at 204. This would involve, as we held in *Rogers*, "focusing on the product and its *relative value to society* . . . ." *Id.* (emphasis added). Thus, despite the fact that its product cannot be made safer for its intended use, a pesticide manufacturer could demonstrate the product serves an important enough function (e.g., in the realm of food production) so as to justify its unavoidable risks.

Where a claimant under the WPLA could demonstrate the existence of safer alternative pesticides that could serve the same purpose with *less* risk of harm, the challenged pesticide's social value could be achieved through the use of another pesticide. Accordingly, the challenged pesticide could not be deemed "necessary regardless of the risks involved to the user." *Rogers*, 116 Wn.2d at 204. There need not be a finding of overwhelming social utility. Killing aphids on apple trees might not be of *overwhelming* social utility, but it might be shown to be substantially important to preserve an apple crop. The test adopted by a federal court, applying Colorado law, is helpful:

> For the rule precluding liability for unavoidably unsafe products to apply to a given product, the product's utility must greatly outweigh the risk created by its use, the risk must be a known one, the product's benefit must not be achievable in another manner, and the risk must be unavoidable under the state of knowledge existing at the time of manufacture.

*Arkansas-Platte & Gulf Partnership*, 886 F. Supp. at 767 (citing *Camacho v. Honda Motor Co.*, 741 P.2d 1240, 1244 n.5 (Colo. 1987), *cert. dismissed*, 485 U.S. 901, 108 S. Ct. 1067, 99 L. Ed. 2d 229 (1988)). This analysis is likewise consistent with our holdings in *Terhune* and *Rogers*.

 Since we hold that the question of whether a pesticide is governed by comment *k* is to be determined on a product-by-product basis, as opposed to a blanket exemption like that for medical products, it necessarily follows that the trier of fact should determine a pesticide's value to society relative to the harm it causes. For example, here the parties debate over whether Phosdrin was primarily used to improve the cosmetic appearance of the apples or to preserve crop yields. This is a question for a jury to resolve.[11]

 Our answer to the second question certified by the Ninth Circuit is "yes," a pesticide *can* be an "[u]navoidably unsafe product" as described in comment *k* to *Restatement (Second) of Torts* § 402A (1965), if its utility greatly outweighs the risks posed by its use.

## CONCLUSION

We answer both questions certified by the Ninth Circuit in the affirmative. Under the WPLA's risk-utility test, a plaintiff may rely upon an alternative *product* to show that the challenged product's risks outweigh the adverse effects of using an alternative *design*. A pesticide *can* be an "[u]navoidably unsafe product" as described in comment *k* to *Restatement (Second) of Torts* § 402A (1965), but only if its utility greatly outweighs the risks posed by its use.

---

[11] In *Lewis v. American Cyanamid Co.*, 155 N.J. 544, 715 A.2d 967 (1998), a case involving a design defect claim involving an insecticide propellant's flammability, the New Jersey Supreme Court found "disputed issues of material fact regarding the practicality and feasibility" of an alternative propellant. *Id.* at 979. The defendant manufacturer sought "immunity from liability resulting from its decision to use a more flammable propellant than one that was a suspected teratogen and ozone-depleter." *Id.* at 980. The court wrote that "[s]o fact sensitive a determination . . . is particularly amenable to risk-utility analysis by a jury." *Id.* Accordingly, it held as follows:

> [W]e conclude that plaintiff has established a *prima facie* case that P-22 was a practical and feasible alternative that would have reduced the flammability of the foggers' propellant. . . . We take no position, however, on the issue of whether plaintiff has met his burden. This is an issue for the jury to decide at retrial.

*Id.*

GUY, C.J., and SMITH, JOHNSON, MADSEN, ALEXANDER, and IRELAND, JJ., concur.

TALMADGE, J. (concurring/dissenting) — I agree with the majority's answer to the first of the certified questions here, but not its answer to the second question. I write separately to express my concern about the reach of the majority's analysis, and to reiterate my belief we have ignored the plain language of the Washington product liability act (WPLA), chapter 7.72 RCW.

The majority answers the first question posed to us by the United States Court of Appeals for the Ninth Circuit by indicating a plaintiff may establish a prima facie case that a product's design is defective for purposes of RCW 7.72.030(1)(a) by proving the existence of an alternate product to the product manufactured by the defendant. The majority holds "a plaintiff *may* satisfy the requirement of showing an adequate alternative design by showing that other products can more safely serve the same function as the challenged product." Majority op. at 504–05. I agree.

The majority also notes in footnote 8 the statutory requirement that an adequate alternate design must be shown to be practical and feasible. Again, I agree. "The plaintiff thus bears the burden of demonstrating an alternative design that was practical and feasible." Philip A. Talmadge, *Washington's Product Liability Act*, 5 U. PUGET SOUND L. REV. 1, 9 (1981).[12]

My larger concern with the majority's answers to both questions in this case, however, is that the majority perpetuates and further confuses our law on defective design

---

[12] This is not an academic question in the real world of product liability litigation. Arguably, a bicycle can more safely serve the transportation function of an automobile and an abacus can more safely serve the function of a calculator, but neither serves as a *reasonable* alternative to the product in question, and neither would enable a plaintiff to establish a prima facie case under RCW 7.72.030(1)(a). A plaintiff establishes a prima facie case under RCW 7.72.030(1)(a) *only* if the plaintiff sustains the burden of demonstrating the alternate product was a practical alternative to the defendant's product in the relevant market, and the alternative produce was economically feasible, that is, it could actually be manufactured at a competitive price to the defendant's product.

in product liability law. *See, e.g., Soproni v. Polygon Apartment Partners*, 137 Wn.2d 319, 333-39, 971 P.2d 500 (1999) (Talmadge, J., concurring and dissenting).

Ironically, the majority's analysis of a design defect case employs the traditional risk-utility test that is the essence of the *negligence* analysis famously set out by Judge Learned Hand in *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947) ("if the probability be called P; the injury, L; and the burden, B; liability depends upon whether B is less than L multiplied by P: i.e., whether B < [is less than] PL."). Yet, the majority continues to adhere to the fiction we first espoused in *Falk v. Keene Corp.*, 113 Wn.2d 645, 782 P.2d 974 (1989), that the Legislature really did not mean negligence when it used that word in RCW 7.72.030(1) and instead we should employ a strict liability analysis to design defect cases that focuses *only* on the reasonable safety of the product. *Falk*, 113 Wn.2d at 651.

We perpetuate analytical mush when we say on the one hand, as the majority does here, we must analyze the manufacturer's conduct by balancing the utility and risk of the manufacturer's design and, on the other hand, say the manufacturer is strictly liable and we must look only to the manufacturer's product.

The better analysis remains in adherence to the language of RCW 7.72.030(1) on product design. RCW 7.72.030(1)(a) articulates a negligence standard for product design cases. This standard mandates a balancing of the product's risk and utility. In enacting the WPLA, the Legislature was expressly guided by the principles of the United States Department of Commerce's Model Uniform Product Liability Act (UPLA):

> The Committee has utilized the UPLA as a focal point for its consideration of product liability tort reform, and, to a great extent, the final proposal of the Committee closely adheres to its substance, if not its precise language, in four key areas.

1 SENATE JOURNAL, 47th Leg., Reg. Sess. 624 (Wash. 1981). One of those areas was design defect.

The comments to section 104 of the UPLA reveal a negligence standard was appropriate in a design defect case:

> The trier of fact is instructed to impose liability if it finds that the product was unreasonably unsafe in design. The trier of fact is also given a formula to assist it in making this determination. The approach has its roots in the law of negligence and has been put into modern and appropriate product liability terminology by some courts in their attempt to resolve the defective design dilemma.

44 Fed. Reg. 62,723 (1979).

The UPLA contained an express provision, section 106, on unavoidably dangerous products. 44 Fed. Reg. 62,727-28 (1979). The Legislature chose not to incorporate this section into the WPLA undoubtedly because it believed this section to be redundant in light of the formula for design defect articulated in RCW 7.72.030(1)(a). The cases the majority cites for the adoption of comment *k* to the *Restatement (Second) of Torts* § 402A (1965) either predate the Legislature's enactment of the WPLA or neglect to discuss this critical aspect of the WPLA's history.

I would decline to incorporate comment k to the *Restatement (Second) of Torts* § 402A into the WPLA when the Legislature expressly declined to do so. I note, moreover, adherence to the analysis of the *Restatement (Second) of Torts* seems unusual in light of the ferment associated with the advent of the *Restatement (Third) of Torts*. The law has progressed and our understanding of product liability law has changed and become more explicit.

For instance, section 2 of the *Restatement (Third) of Torts* (1998) states:

Categories of Product Defect

> A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product:
>
> (a) contains a manufacturing defect when the product de-

parts from its intended design even though all possible care was exercised in the preparation and marketing of the product;

(b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe;

(c) is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe.

Subsection (b) concerns design defects. Comment *a* to section 2 states:

In contrast to manufacturing defects, design defects and defects based on inadequate instructions or warnings are predicated on a different concept of responsibility. In the first place, such defects cannot be determined by reference to the manufacturer's own design or marketing standards because those standards are the very ones that plaintiffs attack as unreasonable. Some sort of independent assessment of advantages and disadvantages, to which some attach the label "risk-utility balancing," is necessary. Products are not generically defective merely because they are dangerous. Many product-related accident costs can be eliminated only by excessively sacrificing product features that make products useful and desirable. Thus, the various trade-offs need to be considered in determining whether accident costs are more fairly and efficiently borne by accident victims, on the one hand, or, on the other hand, by consumers generally through the mechanism of higher product prices attributable to liability costs imposed by courts on product sellers.

Subsections (b) and (c), which impose liability for products that are defectively designed or sold without adequate warnings or instructions and are thus not reasonably safe, achieve the same general objectives as does liability predicated on negligence. . . .

In general, the rationale for imposing strict liability on manufacturers for harm caused by manufacturing defects does not apply in the context of imposing liability for defective design and defects based on inadequate instruction or warning. Consumer expectations as to proper product design or warning are typically more difficult to discern than in the case of a manufacturing defect. Moreover, the element of deliberation in setting appropriate levels of design safety is not directly analogous to the setting of levels of quality control by the manufacturer. When a manufacturer sets its quality control at a certain level, it is aware that a given number of products may leave the assembly line in a defective condition and cause injury to innocent victims who can generally do nothing to avoid injury. The implications of deliberately drawing lines with respect to product design safety are different. A reasonably designed product still carries with it elements of risk that must be protected against by the user or consumer since some risks cannot be designed out of the product at reasonable cost.

Most courts agree that, for the liability system to be fair and efficient, the balancing of risks and benefits in judging product design and marketing must be done in light of the knowledge of risks and risk-avoidance techniques reasonably attainable at the time of distribution. To hold a manufacturer liable for a risk that was not foreseeable when the product was marketed might foster increased manufacturer investment in safety. But such investment by definition would be a matter of guesswork. Furthermore, manufacturers may persuasively ask to be judged by a normative behavior standard to which it is reasonably possible for manufacturers to conform. For these reasons, Subsections (b) and (c) speak of products being defective only when risks are reasonably foreseeable.

Comment *f* to section 2 states, in part:

In sum, the requirement of Subsection (b) that a product is defective in design if the foreseeable risks of harm could have been reduced by a reasonable alternative design is based on the commonsense notion that liability for harm caused by product designs should attach only when harm is reasonably preventable. For justice to be achieved, Subsection (b) should not be construed to create artificial and unreasonable barriers to recovery.

Unmistakably and indisputably, the *Restatement (Third) of Torts* applies a negligence analysis to design defects, as did the WPLA in 1981, and we should do the same in our decisional law. We should no longer ignore the explicit language of the WPLA and developments in the common law of product liability.

I believe a product manufacturer may argue a product is unavoidably unsafe within the context of the risk/utility balancing of RCW 7.72.030(1)(a). Thus, I would answer the second of the certified questions with a "no."

SANDERS, J., concurs with TALMADGE, J.