IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| DOROTHY L. PAYNE, Individually and as the personal representative of the Estate of BECKY S. ANDERSON, deceased, | ) ) ) ) ) | No. 71411-2-I DIVISION ONE |
| Appellant, | ) ) ) | |
| v. | ) ) ) | |
| DONALD R. PAUGH; WENATCHEE VALLEY MEDICAL CENTER, P.S.; LINDA K. SCHATZ; WENATCHEE ANESTHESIA ASSOCIATES; LASER ENGINEERING, INC., a foreign corporation; MEDTRONIC, INC.; MEDTRONIC XOMED, INC.; and UNKNOWN JOHN DOES, | ) ) ) ) ) ) ) ) ) ) ) | PUBLISHED OPINION |
| Respondents, | ) ) | |
| CENTRAL WASHINGTON HEALTH SERVICES ASSOCIATION d/b/a CENTRAL WASHINGTON HOSPITAL, a Washington Corporation; | ) ) ) ) ) | |
| Nonparty Defendant. | ) | FILED: September 28, 2015 |

SCHINDLER, J. — Becky S. Anderson was seriously injured during elective throat surgery. Anderson filed a negligence lawsuit against otolaryngologist Dr. Donald Paugh and Wenatchee Valley Medical Center PS, anesthesiologist Dr. Linda Schatz and Wenatchee Anesthesia Associates, Central Washington Hospital, and medical device

manufacturer Medtronic Inc. and Medtronic Xomed Inc. (Medtronic). Following a seven-week trial, the jury found Dr. Paugh and Wenatchee Valley Medical Center, Dr. Schatz and Wenatchee Anesthesia Associates, and nonparty Central Washington Hospital negligent and that the negligence was a proximate cause of the injury to Anderson. The jury found medical device manufacturer Medtronic was not negligent. The jury awarded Anderson $18 million in damages. The jury attributed 42.5 percent of the negligence to Dr. Paugh and Wenatchee Valley Medical Center, 52.5 percent to Dr. Schatz and Wenatchee Anesthesia Associates, and 5 percent to the hospital. The court entered a judgment on the jury verdict against Dr. Paugh and Wenatchee Valley Medical Center, and Dr. Schatz and Wenatchee Anesthesia Associates. Anderson appeals the jury verdict in favor of Medtronic. Anderson concedes a negligence standard applies to the design defect claim against medical device manufacturer Medtronic under Restatement (Second) of Torts section 402A comment k (1965). Nonetheless, Anderson claims the court erred in refusing to give a proposed supplemental jury instruction that is used for a strict liability design defect claim to define the duty of a medical device manufacturer under Restatement (Second) of Torts section 402A comment k. We disagree, and affirm the jury verdict.

FACTS

The Surgery

In January 2012, Becky S. Anderson went to see otolaryngologist Dr. Donald Paugh about "[a] cough and some hoarseness." Dr. Paugh diagnosed a benign vocal cord polyp and recommended tracheal laser surgery. Anderson decided to proceed

with the elective tracheal laser surgery. Dr. Paugh scheduled the surgery for February 3, 2012 at Central Washington Hospital.

Before the surgery began, the hospital operating room staff mistakenly told Dr. Paugh and anesthesiologist Dr. Linda Schatz that only the single-cuff "Laser-Shield II" endotracheal tube manufactured by Medtronic was available.

The Laser-Shield II is designed for endotracheal intubation during laser surgeries and has "a laser resistant overwrap on the main shaft." However, the "Instructions for Use" state the inflatable cuff that seals the airway and prevents oxygen and other flammable gas from reaching the surgical field is not laser resistant. The Instructions for Use warn users that contacting the cuff with a laser "may cause deflation of the cuff and result in combustion and fire." The instructions tell users to place wet cotton gauze around the cuff to protect from laser strike. To alert users to a rupture, the Laser-Shield II cuff-inflation valve is equipped with blue methylene dye that stains the cotton gauze if the cuff is punctured. The Instructions for Use warn of the risk of fire due to "elevated oxygen levels or other flammable gases" and recommend using a "30% oxygen / 70% helium, or 30% oxygen / 70% room air" combination.

Neither Dr. Paugh nor Dr. Schatz had ever used the Laser-Shield II. Dr. Paugh had used only a double-cuff endotracheal tube manufactured by Mallinckrodt Inc. The double-cuff tube has a lower cuff that seals the airway to prevent oxygen from leaking out and an upper cuff that shields the lower cuff from damage from the laser.

Nonetheless, Dr. Paugh and Dr. Schatz decided to proceed with the surgery and use the Laser-Shield II. Neither Dr. Paugh nor Dr. Schatz read the Laser-Shield II Instructions for Use. Contrary to the Instructions for Use, Dr. Schatz administered 100

3

percent oxygen, not the recommended 30 percent. During the surgery, Dr. Paugh perforated the inflatable cuff of the tube with the laser causing oxygen to leak into the surgical site and ignite. The airway fire caused serious burns to Anderson's trachea and lungs.

The Lawsuit

Anderson filed a complaint against Central Washington Hospital, Dr. Paugh and Wenatchee Valley Medical Center, and Dr. Schatz and Wenatchee Anesthesia Associates alleging medical negligence, and alleging product liability against medical device manufacturer Medtronic Inc. and Medtronic Xomed Inc. (Medtronic). Anderson alleged Dr. Paugh and Dr. Schatz breached the standard of care resulting in the injuries to Anderson. Anderson alleged Medtronic was "liable under the Washington Products Liability Act R.C.W. Chapter 7.72" for defect in production or construction. In the amended complaint, Anderson alleged Medtronic was liable under the Washington product liability act, chapter 7.72 RCW.

Summary Judgment

Anderson filed a motion for partial summary judgment arguing there was no dispute Dr. Schatz was negligent in administering 100 percent oxygen. Anderson also argued Dr. Schatz acted as an agent of the hospital. The court granted the motion in part, ruling Dr. Schatz and Wenatchee Anesthesia Associates were negligent as a matter of law.

Following discovery, Medtronic filed a motion for summary judgment dismissal of claims alleging design defect, failure to warn, and manufacturing or production defect. Medtronic argued the Laser-Shield II is a prescription medical device governed by the

negligence standard under <u>Restatement (Second) of Torts</u> section 402A comment k (1965), and there was no evidence of defective design. Medtronic argued that because the Laser-Shield II warnings "were adequate as a matter of law," it was entitled to dismissal of the failure to warn claim. Medtronic also argued Anderson could not show that "any allegedly deficient warnings or instructions proximately caused her injuries." Medtronic submitted the deposition testimony of Dr. Paugh and Dr. Schatz admitting they did not read the Laser-Shield II Instructions for Use before the surgery.

In response, Anderson did not dispute that the negligence standard under <u>Restatement (Second) of Torts</u> section 402A comment k applied to the design defect claim. Relying on the Washington Pattern Jury Instruction 110.02.01, "Manufacturer's Duty—Design—Unavoidably Unsafe Products—Negligence—Comment K," Anderson argued there were material issues of fact as to Medtronic's breach of the duty to use reasonable care to design a product that was reasonably safe and on proximate cause.[1] 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 110.02.01, at

---

[1] The brief in opposition to summary judgment states, in pertinent part:

For comment k products, this standard is modified to the extent that negligence is included within the legal standard. WPI 110.02.01 has modified the jury instruction as follows:

A medical product manufacturer has a duty to use reasonable care to design medical products that are reasonably safe. "Reasonable care" means the care that a reasonably prudent medical product manufacturer would exercise in the same or similar circumstances. A failure to use reasonable care is negligence.

The question of whether a manufacturer exercised reasonable care is to be determined by what the manufacturer knew or reasonably should have known at the time of the plaintiff's injury.

In determining what a manufacturer reasonably should have known in regard to designing its product, you should consider the following:

A medical product manufacturer has a duty to use reasonable care to test, analyze, and inspect the products it sells, and is presumed to know what such tests would have revealed.

A medical product manufacturer has a duty to use reasonable care to keep abreast of scientific knowledge, discoveries, advances, and research in the field, and is presumed to know what is imparted thereby.

635 (6th ed. 2012) (WPI). Anderson also argued that because the information on the Laser-Shield II box was inadequate and deceptive, there were material issues of fact on failure to warn.

At the summary judgment hearing, Anderson's attorney confirmed that the comment k negligence standard under Restatement (Second) of Torts section 402A applied to the design defect claim against Medtronic and withdrew any alleged claims for breach of warranty and construction or manufacturing defect.

The court granted in part and denied in part Medtronic's motion for summary judgment. The court granted Medtronic's motion to dismiss the failure to warn claim. The court denied the motion to dismiss the negligent design claim.

> The Court hereby ORDERS that Medtronic, Inc. and Medtronic, Xomed, Inc.'s Motion for Summary Judgment is hereby GRANTED IN PART and DENIED IN PART.
> The Medtronic Defendants' Motion is GRANTED as to Plaintiff's claims for failure to warn or inadequate warnings. All such claims are hereby dismissed with prejudice and without fees or costs to any party.
> Plaintiff has withdrawn her claims for breach of warranty and unsafe construction or manufacturing defect, to the extent such claims were stated in the Complaint.
> . . . .
> The Medtronic Defendants' motion is DENIED and Plaintiff may proceed against the Medtronic Defendants as to her claim for negligent design.

Before trial, Central Washington Hospital settled with Anderson for $12 million. The court entered an agreed order dismissing the hospital but granted Anderson's motion to identify the hospital as a nonparty defendant at trial for purposes of allocating fault.

Trial

At the beginning of the seven-week jury trial and before opening statements, the court agreed to read a number of instructions on the law to the jury including the "Pre-Instruction" Anderson submitted on the negligent design claim, Medtronic's duty, and the standard of care that applies to the manufacturer of an unavoidably unsafe product under comment k, Restatement (Second) of Torts section 402A. The Pre-Instruction Anderson submitted is based on WPI 110.02.01, Manufacturer's Duty—Design—Unavoidably Unsafe Products—Negligence—Comment K.

The court told the jury the instructions "will apply throughout the trial."

Now I'm going to instruct you on the law, which will guide your decision making in this case. We will reinstruct you at the end of the trial. There may be additional instructions, but these instructions will apply throughout the trial.

The Pre-Instruction on the duty of medical device manufacturer Medtronic states:

A medical product manufacturer has a duty to use reasonable care to design medical products that are reasonably safe. "Reasonable care" means the care that a reasonably prudent medical product manufacturer would exercise in the same or similar circumstances. A failure to use reasonable care is negligence.
The question of whether a medical product manufacturer exercised reasonable care is to be determined by what the manufacturer knew or reasonably should have known at the time the product left the defendant's control.
In determining what a medical product manufacturer reasonably should have known in regard to designing its product, you should consider the following:
A medical product manufacturer has a duty to use reasonable care to test, analyze, and inspect the products it sells, and is presumed to know what such tests would have revealed.
A medical product manufacturer has a duty to use reasonable care to keep abreast of scientific knowledge, discoveries, advances, and research in the field, and is presumed to know what is imparted thereby.

7

During opening statement, Anderson argued Dr. Paugh breached the standard of care by failing to adequately protect the Laser-Shield II cuff, failing to make sure the oxygen was at a safe level, and failing to inform Anderson of the risk of fire. Anderson argued Dr. Schatz violated the standard of care by administering 100 percent oxygen during the laser procedure. Anderson also argued Dr. Paugh and Dr. Schatz violated the standard of care by proceeding with the surgery despite being unfamiliar with the Laser-Shield II, not reading the Instructions for Use, and failing to have a plan in place in the event of a fire.

Anderson argued Medtronic was negligent in using a single-cuff instead of a double-cuff design for the Laser-Shield II. Anderson also argued Medtronic was aware of problems with the Laser-Shield II, including a number of other airway fires, but did nothing to make the device safer. Anderson argued the negligence of each of the defendants was a proximate cause of injury.

More than 30 witnesses testified during the seven-week jury trial including a number of expert witnesses.

Anderson's experts testified that the fire occurred because Dr. Paugh perforated the cuff with the laser causing the extremely flammable 100 percent oxygen administered by Dr. Schatz to enter the surgical field and ignite. Anderson's experts testified that the fire would not have occurred if Dr. Schatz had administered a lower oxygen concentration or if Dr. Paugh had properly protected the cuff. Dr. James Reibel testified that Dr. Paugh violated the standard of care for a surgeon by failing to inform Anderson of the risk of fire before the laser surgery, proceeding with the surgery despite being unfamiliar with the Laser-Shield II endotracheal tube, not communicating with Dr.

Schatz about the level of oxygen being administered, and not adequately protecting the cuff.

Dr. Barry Swerdlow and Dr. Vladimir Nekhedzy testified that Dr. Schatz violated the standard of care for an anesthesiologist by administering 100 percent oxygen to Anderson during the procedure and not telling Dr. Paugh about the high oxygen level.

Anderson's medical device expert Dr. George Samaras testified Medtronic failed to act as a "reasonably prudent medical product company" in not using a double-cuff design for the Laser-Shield II. Dr. Samaras testified that in his opinion, the single-cuff design is "inherently less safe than the double cuff." Dr. Samaras stated a double-cuff design is safer because it provides a "redundant safety system." If the upper cuff is punctured, the lower cuff continues to seal the airway to prevent oxygen from leaking into the surgical field and coming into contact with the laser. Dr. Samaras testified that since 2000, there had been eight reported airway fires involving the Laser-Shield II. According to Dr. Samaras, during that same time, there had been only one reported airway fire involving the double-cuff endotracheal tube manufactured by Mallinckrodt.

Dr. Jonathan Benumof, an anesthesiologist and consultant for endotracheal tube manufacturers, testified that in his opinion, the fire would not have occurred if Dr. Schatz and Dr. Paugh had used a double-cuff endotracheal tube. However, on cross-examination, Dr. Benumof testified that the Laser-Shield II could be used safely. Dr. Benumof also said that surgeons and anesthesiologists in his hospital had used the Laser-Shield II for years without incident and continued to use the Laser-Shield II. In response to a juror question, Dr. Benumof stated he "personally and successfully" used the Laser-Shield II.

Dr. Paugh testified he decided to proceed with the laser surgery and use the Laser-Shield II because it "seemed like a very reasonable substitute" to the endotracheal tube he typically used and he had "no reason . . . to question the safety of that device." Dr. Paugh admitted he did not read the Laser-Shield II Instructions for Use. Dr. Paugh testified he knew the cuff of an endotracheal tube is "susceptible to a laser strike" but believed he "adequately protected the cuff" during the surgery. Dr. Paugh denied perforating the cuff of the Laser-Shield II with the laser. Dr. Paugh testified he did not know what role the cuff played in the fire but he believed the fire would have been "[v]ery unlikely" to occur if he and Dr. Schatz had used the double-cuff tube he had previously used for laser surgeries.

Dr. Barry Wenig testified as an expert witness on behalf of Dr. Paugh. Dr. Wenig testified that in his opinion, Dr. Paugh "met the standard of care of a reasonably prudent otolaryngologist in his care and treatment of Ms. Anderson." In Dr. Wenig's opinion, the presence of oxygen "in the space between the cuff and the vocal cords" and the "likelihood" of oxygen passing from "the area below the cuff to the area above the cuff" caused the fire. On cross-examination, Dr. Wenig testified that since 2003, he has used the Laser-Shield II "almost exclusively" and did not have any safety concerns with the device.

Dr. Schatz testified that she did not read the Laser-Shield II Instructions for Use because she had "used lots of different endotracheal tubes" and the Laser-Shield II "was not different in form or function than any other endotracheal tube." Dr. Schatz testified she knew that the cuff was not laser resistant and that a 30 percent oxygen concentration was recommended in laser procedures. Dr. Schatz admitted she made a

"mistake" by leaving "the oxygen on 100 percent" but testified she was more than "99 percent" sure she "got a proper, adequate seal of the cuff" to prevent oxygen from leaking into the surgical field. Dr. Schatz testified the first indication that there was a problem during surgery was when she "heard a pop" and "heard Dr. Paugh ask for saline." Dr. Schatz testified she did not know what caused the fire.

Medtronic called a number of witnesses to testify at trial including James Hissong, the mechanical engineer responsible for the design and testing of the Laser-Shield II; medical device design expert Dr. Samsun Lampotang; and otolaryngologist Dr. Paul Flint. Medtronic also presented evidence regarding compliance with United States Food and Drug Administration (FDA) regulations, medical device reporting, and corrective and preventive actions related to the Laser-Shield II.

Hissong testified that in 1989, Medtronic initially considered using a double-cuff design but ultimately decided to use a single-cuff design for the Laser-Shield II. Hissong testified a double-cuff design can give users a "false sense of security" in continuing the procedure even though the lower cuff and tube are vulnerable to puncture. Hissong also testified the double cuff can prevent the user from realizing that the upper cuff is damaged.

Hissong testified that Medtronic modified the Laser-Shield II in 1999 to prevent "inadvertent cuff rupture" by "extend[ing] the wrapping" underneath the cuff and adding a section "that would be more laser resistant," making "the Laser-Shield II the most laser-resistant tube on the market." Hissong testified Medtronic investigated each of the reports of airway fires and concluded that in seven of the eight reports, the surgeon or anesthesiologist was responsible for the airway fire.

Mechanical engineer and medical device design expert Dr. Samsun Lampotang is a professor of anesthesiology, affiliate professor of mechanical engineering and aerospace engineering, and affiliate professor of biomedical engineering at the University of Florida. Dr. Lampotang testified that in his opinion, Medtronic exercised the care that a reasonably prudent medical device manufacturer would exercise in designing and testing the Laser-Shield II and the device was reasonably safe. Dr. Lampotang disagreed with Dr. Samaras that the double-cuff design is a "redundant safety system." Dr. Lampotang testified the two cuffs perform different functions: the upper cuff acts as a barrier, protecting the cuff below from laser strike, while the lower cuff seals the trachea and prevents oxygen from leaking out. Dr. Lampotang testified that in his opinion, the single "lay flat" cuff on the Laser-Shield II "provides a better seal" than the "preshaped" cuff used in the double-cuff design. Dr. Lampotang also testified that it was more difficult to detect quickly a leak in a double-cuff endotracheal tube.

Dr. Paul Flint, the chair of otolaryngology, head, and neck surgery at Oregon Health and Science University, testified about the double-cuff and single-cuff endotracheal tubes manufactured by Mallinckrodt and Medtronic. Dr. Flint testified that he had used the Mallinckrodt double-cuff endotracheal tube in approximately 50 surgeries and the Medtronic Laser-Shield II in approximately 200 surgeries. Dr. Flint testified the Laser-Shield II provided "better laser resistance" and additional protection. Dr. Flint also testified about a 1994 study published by Dr. Mitchell Sosis. Dr. Flint testified that it was the only study that compared the Mallinckrodt double-cuff endotracheal tube and the single-cuff Laser-Shield II endotracheal tube. Dr. Flint said the study showed that "under extreme conditions," the Mallinckrodt dual-cuff tube

combusted but the Laser-Shield II did not. Dr. Flint also testified about Medtronic's investigation of each of the eight "adverse events" involving the Laser-Shield II and agreed with the conclusion that "user error" on the part of the surgeon or anesthesiologist was involved in seven of the eight events.

Timothy Ulatowski is the vice president of a consulting company for medical device manufacturers. Ulatowski testified about the design of the Laser-Shield II and the FDA regulations, procedures, and policies. Ulatowski testified that as designed, the Laser-Shield II "is reasonably safe and effective." Ulatowski testified that the FDA also determined that the Laser-Shield II was reasonably safe as designed.

The evidentiary portion of the trial concluded the day before Thanksgiving on Wednesday, November 27. Anderson had submitted "Amended Proposed Instructions" that included the same jury instruction the court read to the jury at the start of the case defining the duty of care that applies to the manufacturer of an unavoidably unsafe medical device based on WPI 110.02.01.

The court scheduled closing arguments for Tuesday, December 3. Before adjourning for the Thanksgiving recess, the court provided the parties with a packet of proposed jury instructions. The court stated it compared the instructions the parties proposed "to the preinstructions to try to be consistent." The court stated the jury instruction on the duty of care of Medtronic as a medical device manufacturer was consistent with the "agreed" Pre-Instruction.

On Monday, December 2, Anderson filed "Supplemental Amended Proposed Instructions." The supplemental instructions included a jury instruction on adherence to governmental standards, an instruction informing the jury that Medtronic did not claim a

13

patent prevented "incorporating a double-cuff into their product," and a jury instruction that sets forth the tests that are used to determine the duty of a manufacturer in a strict liability design defect case.

On December 3, Anderson filed written "Objections and Exceptions to Jury Instructions." Anderson argued that because the "negligence instruction to be given by the Court refers to the duty of the manufacturer to use reasonable care 'to design medical devices that are reasonably safe' " and the instruction "taken from WPI 110.02.01 . . . defines 'reasonable care' but it does not define 'reasonably safe' or instruct the jury as to the factors to be considered in determining whether or not a product is reasonably safe," the "instructions for the jury in determining whether a product is not reasonably safe are found in WPI 110.02."[2] Anderson claimed the "proposed instructions are based upon WPI 110.02, and should be given in addition to those in WPI 11[0].02.01, which define the reasonable care."

The court refused to give the proposed supplemental jury instruction based on WPI 110.02. The court decided to use the Amended Proposed Instruction Anderson previously submitted on November 27 to instruct the jury on the negligent design defect claim against Medtronic based on WPI 110.02.01, Manufacturer's Duty—Design— Unavoidably Unsafe Products—Negligence—Comment K, to instruct the jury on the duty of a medical device manufacturer of an unavoidably unsafe product under comment k of Restatement (Second) of Torts section 402A.

In closing argument, Anderson argued the hospital was negligent in giving the doctors the "wrong tube." Anderson argued Dr. Paugh violated the standard of care by "hitting the cuff and deflating the cuff with the laser" causing the airway fire. Anderson

---

[2] Emphasis in original.

also argued Dr. Paugh did not obtain Anderson's informed consent to use the Laser-Shield II. Anderson asserted Dr. Schatz violated the standard of care and caused the airway fire by administering "100 percent oxygen." Anderson argued Medtronic did not design the "safest device possible for all reasonably foreseeable circumstances" and did not "test and analyze [the] product to make it safer." Anderson argued Medtronic knew of problems with the Laser-Shield II and failed to act to make its product safer by incorporating a double-cuff design.

> I would like you to think about this question as you listen to counsel for Medtronic talk. Since September of 2000, when the Laser-Shield II enhanced was launched, what did you do to test and analyze your product to try to make it safer? What did they do? Just listen to the evidence. What did they do?
>
> One thing we know is that including [Anderson's] case, that there were ten adverse events. Four of those events were life-threatening. Four of those events were life-threatening before [Anderson]. What we do know is that the company has told you that they didn't do anything since September of 2000. They have no plans to do anything in the future. No testing. No study. No analysis. They're just going to blame the doctors and the hospitals and the users for what's gone on out there with this product.
>
> . . . .
>
> I wanted to say that first because I think that's the single most important thing in terms of Medtronic's case that you're here to decide. Well, what did they do? Did they take actions to try and make their product safer or did they close their eyes?
>
> . . . .
>
> In terms of reasonable care, if you could turn to exhibit number 20, the next exhibit. This defines what reasonable care is. And reasonable care, pardon me if I don't read it all, is basically to design the medical devices that are reasonably safe, and their obligation and duty is to act as a reasonably prudent medical device company.
>
> . . . .
>
> So when you answer this question, since September of 2000, what did you do to test and analyze your product to make it safer, this is the standard that would apply. Were they trying to make the best and safest device possible for all reasonable foreseeable circumstances in the ten to twelve years between the launch of this product and when [Anderson] got burned?

15

If you'd go back to . . . the burden of proof instruction, it gives you a guide. If you go back to instruction number 19, we're claiming that they did not — they did not meet their burden to make the safest and best device possible because they didn't test and analyze their product. They didn't incorporate into their product a known safety feature, which is the double cuff.

Dr. Paugh argued the fire occurred because oxygen leaked out around the cuff of the Laser-Shield II "without the laser striking the cuff at all." Dr. Paugh also argued he did not have a duty to warn Anderson of the risk of airway fire during a laser procedure because it was an "incredibly rare event."

Dr. Schatz argued the high oxygen level was not a proximate cause of the fire. According to Dr. Schatz, "there was no leak with that cuff" and there were a number of other ways the fire could have occurred, including laser strike and perforation of the cuff.

Medtronic argued the only witness Anderson called to testify about the design of the Laser-Shield II was not qualified and the overwhelming evidence presented by the other witnesses established it was not negligent. Medtronic described the testimony of the design engineers and medical experts to show the Laser-Shield II was reasonably safe as designed and Medtronic met the standard of care.

[W]hat about all these standard, regulations, guidances, information, all the parties brought before you.
. . . .
. . . [I]f you are going to use these endotracheal tubes, which can be lit on fire, can be caught on fire unfortunately, you know, then use one with a cuff. Use one that's laser resistant. Which ours meets both those qualifications. It doesn't say use a dual cuff or a triple cuff or a quadruple cuff. It says cuffed. Cuffed. That's what this standard says.
. . . And so what is the literature? Well, you know, you heard Dr. Flint, and I used this also with Dr. Benumof, the Sosis article. You hear Sosis' name. He's written quite a bit on airway fires. And he did a study and you heard, remember Dr. Flint said, this is the only study that compares the two, in terms of peer-reviewed literature, Dr. Flint says, and

I believe based on this and everything else, my use, my clinical use, the single cuff laser is safer. But if you look at this with the application of a liability there was immediate combustion in all four Mallinckrodt LaserFlex tubes, and it ultimately said this is the Xomed Laser Shield II endotracheal tubes provides good protection. Reasonably safe design. Standards say so. Regulations say so. Vast majority of witnesses say so.

Medtronic also pointed to the evidence that showed it met the standard of care to test, analyze, and inspect and to keep abreast of scientific knowledge and research.

> [T]he manufacturer has a duty to use reasonable care to test and analyze and inspect. As had been described by Mr. Hissong, and Mr. Ulatowski with submissions, and Dr. Lampotang, Dr. Flint. And then also the manufacturer has a duty to use reasonable care to keep abreast of scientific knowledge, discoveries, advances, and researches in the field.
>
> Well, you will remember that, on this point, what was the evidence on this? On testing, analyzing and inspecting? Well, you received testimony from Mr. Hissong, Mr. Ulatowski, Dr. Lampotang. They all reviewed the extensive testings, including on the cuff and the area below. . . . The FDA reviewed testing and they didn't request anymore. They asked questions. . . . You will see all that.
>
> The testing that's listed right on the [Instructions for Use], which is Exhibit 503, that you will have in evidence. Years of clinical results. Thousands and thousands of patients. Feedback from the physicians, the leaders at the conferences. And remember that testimony that was every single cuff is tested one last time. And in addition he said, worst case scenario testing is conducted. . . . So all that testing was described to you.
>
> And what about keeping abreast of the scientific, knowledge, discoveries, advances, and research of the field? Well, remember the slide in his testimony? I had Mr. Hissong on the stand. And I went through all this because I thought this would be important one day. This is all the information, and you will remember this, you will have your notes. He attends conferences. His team is looking at all the data. Keeping abreast. They get monthly reports of all the literature. They have a clinical affairs department. Their marketing department is monitoring. The quality assurance and customer loyalty is looking at adverse events, and doing testing on each returned device, and all the — they have a one eight hundred number to take information. They are attending regulatory conferences.
>
> There is so much information coming in and they are monitoring this. It's not like they put this on the market and that's it. No. Look at all the different departments that are set up out of Jacksonville, out of Xomed keeping abreast of scientific, knowledge, discoveries, advantages of the research of the field. And that's how it's done. That's how they meet this. And [Anderson] didn't present a shred of evidence to counter this.

By special verdict form, the jury found Dr. Schatz and Wenatchee Anesthesia Associates, Dr. Paugh and Wenatchee Valley Medical Center, and nonparty Central Washington Hospital were negligent and proximately caused Anderson's damages in the amount of $18 million. The jury found Dr. Paugh did not fail to obtain the informed consent of Anderson. The jury found Medtronic was not negligent. The jury attributed 52.5 percent of the fault to Dr. Schatz and Wenatchee Anesthesia Associates, 42.5 percent to Dr. Paugh and Wenatchee Valley Medical Center, and 5 percent to the hospital. The court reduced the judgment by $900,000 to account for the fault attributed to the nonparty hospital. The court entered a judgment of $17.1 million against Dr. Schatz and Wenatchee Anesthesia Associates, and Dr. Paugh and Wenatchee Valley Medical Center.

Appeal

Dr. Paugh and Wenatchee Valley Medical Center, and Dr. Schatz and Wenatchee Anesthesia Associates appealed entry of the judgment on the jury verdict. Anderson appealed the order granting Medtronic's motion for summary judgment on failure to warn, the judgment on the verdict in favor of Medtronic, and the award of costs.[3] In July 2014, Dr. Schatz and Wenatchee Anesthesia Associates, and Dr. Paugh and Wenatchee Valley Medical Center filed a motion to withdraw their appeals and dismiss the appeals with prejudice. We granted the motion.

In September 2014, Anderson withdrew her assignment of error as to the summary judgment dismissal of the failure to warn claim against Medtronic. On September 17, we granted the motion to substitute Dorothy L. Payne as the personal

---

[3] This court consolidated the defendants' appeals and linked Anderson's appeal.

representative of the Estate of Becky S. Anderson, deceased, and amend the caption.

ANALYSIS

Refusal to Give Proposed Jury Instruction

Anderson contends the court erred in refusing to give the supplemental proposed instruction based on the WPI used for a strict liability design defect claim, WPI 110.02, "Manufacturer's Duty—Design," to define "reasonably safe" as used in the WPI for a negligent design comment k claim against Medtronic, WPI 110.02.01, Manufacturer's Duty—Design—Unavoidably Unsafe Products—Negligence—Comment K.

Standard of Review

We review the decision not to give a jury instruction for abuse of discretion. Fergen v. Sestero, 182 Wn.2d 794, 802, 346 P.3d 708 (2015). The language of jury instructions are matters left to the trial court's discretion. Young v. Key Pharmaceuticals, Inc., 130 Wn.2d 160, 176, 922 P.2d 59 (1996). " 'Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law.' " Keller v. City of Spokane, 146 Wn.2d 237, 249, 44 P.3d 845 (2002) (quoting Bodin v. City of Stanwood, 130 Wn.2d 726, 732, 927 P.2d 240 (1996)). "[A] 'trial court need never give a requested instruction that is erroneous in any respect.' " Crossen v. Skagit County, 100 Wn.2d 355, 360-61, 669 P.2d 1244 (1983) (quoting Vogel v. Alaska S.S. Co., 69 Wn.2d 497, 503, 419 P.2d 141 (1966)).[4]

---

[4] Here, unlike in Hub Clothing Co. v. City of Seattle, 117 Wash. 251, 253-54, 201 P. 6 (1921), and Barrett v. Lucky Seven Saloon, Inc., 152 Wn.2d 259, 274-75, 96 P.3d 386 (2004), the instructions correctly informed the jury of the applicable law, were not misleading, and permitted Anderson to argue her theory of the case. Anderson's theory of the case was that Medtronic violated its duty of care to design medical devices that are reasonably safe.

We review alleged errors of law in jury instructions de novo. Anfinson v. FedEx Ground Package Sys., Inc., 174 Wn.2d 851, 860, 281 P.3d 289 (2012). "An erroneous instruction is reversible error only if it is prejudicial to a party." Fergen, 182 Wn.2d at 803; Barrett v. Lucky Seven Saloon, Inc., 152 Wn.2d 259, 267, 96 P.3d 386 (2004). If the instruction contains a clear misstatement of law, prejudice is presumed and is grounds for reversal unless it can be shown that the error was harmless. Fergen, 182 Wn.2d at 803. The party challenging an instruction bears the burden of establishing prejudice. Griffin v. W. RS, Inc., 143 Wn.2d 81, 91, 18 P.3d 558 (2001).

Strict Liability Design Defect Claim Restatement (Second) of Torts Section 402A

The Restatement (Second) of Torts section 402A addresses design defect claims. Restatement (Second) of Torts section 402A states, in pertinent part, "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user." § 402A(1).

In 1969, the Washington Supreme Court adopted Restatement (Second) of Torts section 402A and strict liability for design defect claims against manufacturers. Ulmer v. Ford Motor Co., 75 Wn.2d 522, 532, 452 P.2d 729 (1969). In Seattle-First National Bank v. Tabert, 86 Wn.2d 145, 154, 542 P.2d 774 (1975), the court held that "[i]f a product is unreasonably dangerous, it is necessarily defective. The plaintiff may, but should not be required to prove defectiveness as a separate matter." For purposes of defining "unreasonably dangerous," the Washington Supreme Court used the consumer expectations standard of "reasonably safe" adopted in Tabert. Falk v. Keene Corp., 113 Wn.2d 645, 649, 782 P.2d 974 (1989) (citing Tabert, 86 Wn.2d at 154); see also

20

Lenhardt v. Ford Motor Co., 102 Wn.2d 208, 212, 683 P.2d 1097 (1984) ("our rule of

strict liability focuses attention upon the product and not upon the actions of the seller or

manufacturer").

> After examining a number of possible formulations for "consumer expectations," we held that liability is imposed if the product is

>> "unsafe to an extent beyond that which would be reasonably contemplated by the ordinary consumer. . . .
>> In determining the reasonable expectations of the ordinary consumer, a number of factors must be considered. The relative cost of the product, the gravity of the potential harm from the claimed defect and the cost and feasibility of eliminating or minimizing the risk may be relevant in a particular case. In other instances the nature of the product or the nature of the claimed defect may make other factors relevant to the issue."

Falk, 113 Wn.2d at 649[5] (quoting Tabert, 86 Wn.2d at 154).

Restatement (Second) of Torts Section 402A Comment K

The Restatement (Second) of Torts section 402A comment k establishes an

exception to strict liability for "unavoidably unsafe products" such as prescription drugs

and medical devices. Ruiz-Guzman v. Amvac Chem. Corp., 141 Wn.2d 493, 505-06, 7

P.3d 795 (2000) (citing Terhune v. A. H. Robins Co., 90 Wn.2d 9, 12, 577 P.2d 975

(1978)). The comment k exception applies to medical devices that have a high risk of

possible harmful effects but are "necessary regardless of the risks involved to the user."

Rogers v. Miles Labs., Inc., 116 Wn.2d 195, 204, 802 P.2d 1346 (1991).

> Restatement (Second) of Torts section 402A comment k states:

> Unavoidably unsafe products. There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself

---

[5] Alteration in original.

21

invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.[6]

The rationale underlying the comment k exception is that the social utility of having certain products available outweighs the risk posed by their use.

> Comment k justifies an exception from strict liability by focusing on the product and its relative value to society, rather than on the manufacturer's position in the stream of commerce. Some products are necessary regardless of the risk involved to the user. The alternative would be that a product, essential to sustain the life of some individuals, would not be available—thus resulting in a greater harm to the individual than that risked through use of the product.

Rogers, 116 Wn.2d at 204.[7]

Washington Product Liability Act

In 1981, the legislature adopted the Washington product liability act (WPLA), chapter 7.72 RCW. LAWS OF 1981, ch. 27, § 1. Under RCW 7.72.030(1), "[a] product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably

---

[6] Emphasis in original.

[7] Italics omitted.

safe as designed or not reasonably safe because adequate warnings or instructions were not provided." RCW 7.72.030(1)(a) states a product "is not reasonably safe" if

> at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, outweighed the burden on the manufacturer to design a product that would have prevented those harms and the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product.

The statute states that "[i]n determining whether a product was not reasonably safe under this section, the trier of fact shall consider whether the product was unsafe to an extent beyond that which would be contemplated by the ordinary consumer." RCW 7.72.030(3).

In Falk, the Washington Supreme Court held that although RCW 7.72.030(1) uses the word "negligence," "ordinary negligence is not the standard for design defect claims" under the WLPA. Falk, 113 Wn.2d at 653. The court held that "because consumer expectations are still to be considered by the trier of fact, the Legislature has retained aspects of the buyer-oriented approach which existed before the tort reform act of 1981." Falk, 113 Wn.2d at 653.

> Section (2) [of RCW 7.72.030] provides that a manufacturer is "strictly liable" for harm caused by products not reasonably safe in construction or in nonconformance with warranties. Significantly, there is no risk-utility balancing test required for this type of product liability claim. Because the Legislature thought that type of balancing to be "akin" to negligence, but did not intend that it be undertaken for claims under section (2), it is also not surprising that the term "strict liability" is used in the section. Put simply, the Legislature evidently doubted that what we termed "strict liability" in Tabert is, or should be called, "strict liability."
> This semantic distinction does not alter the fact that the statute sets forth the same type of design defect analysis which we adopted in Tabert. Therefore, a design defect product liability claim is still a strict liability claim, as the term is used in Tabert. Further, the focus is still on the reasonable safety of the product. Moreover, because consumer expectations are still to be considered by the trier of fact, the Legislature

23

has retained aspects of the buyer-oriented approach which existed before the tort reform act of 1981. This is entirely consistent with the stated purpose of the act "that the right of the consumer to recover for injuries sustained as a result of an unsafe product not be unduly impaired." LAWS OF 1981, ch. 27, § 1.

Falk, 113 Wn.2d at 653.

The court held the WPLA allows the plaintiff to show the product is "not reasonably safe as designed" under a risk utility test or, in the alternative, under the consumer expectations test that requires the plaintiff to show the product was "unsafe to an extent beyond that which would be contemplated by the ordinary consumer." RCW 7.72.030(1)(a), (3); Falk, 113 Wn.2d at 653.

Consistent with the WPLA and case law, the WPI for a strict liability design defect claim against a manufacturer, WPI 110.02, Manufacturer's Duty—Design (Strict Liability Instruction), states the risk utility and consumer expectations tests are used to determine whether a product is not reasonable safety as designed. The comment to the Strict Liability Instruction states that "because the risk-utility test involves strict liability principles," the instructions do not include the term "negligence."[8] WPI 110.02, at 632. The Strict Liability Instruction states:

> A manufacturer has a duty to design products that are reasonably safe as designed.
>
> There are two tests for determining whether a product is not reasonably safe as designed. The plaintiff may prove that the product was not reasonably safe at the time it left the manufacturer's control using either of these two tests.
>
> The first test is a balancing test. Under that test, you should determine whether, at the time the product was manufactured:

---

[8] Further, neither of the burden of proof instructions, the Strict Liability Instruction nor WPI 110.21, include the term "negligence." See Soproni v. Polygon Apartment Partners, 137 Wn.2d 319, 326-30, 971 P.2d 500 (1999); Falk, 113 Wn.2d at 657.

24

> the likelihood that the product would cause injury or damage similar to that claimed by the plaintiff, and the seriousness of such injury or damage
>
> outweighed
>
> the burden on the manufacturer to design a product that would have prevented the injury or damage, and the adverse effect that a practical and feasible alternative design would have on the usefulness of the product.

The second test is whether the product is unsafe to an extent beyond that which would be contemplated by the ordinary user. In determining what an ordinary user would reasonably expect, you should consider the following:

> a.    The relative cost of the product;
>
> b.    The seriousness of the potential harm from the claimed defect;
>
> c.    The cost and feasibility of eliminating or minimizing the risk; and
>
> d.    Such [other] factors as the nature of the product and the claimed defect indicate are appropriate.

> [A product can be "not reasonably safe" even though the risk that it would cause the plaintiff's harm or similar harms was not foreseeable by the manufacturer at the time the product left the manufacturer's control.]

> If you find that the product was not reasonably safe as designed at the time it left the manufacturer's control and this was a proximate cause of the plaintiff's [injury] [and] [or] [damage], then the manufacturer is [subject to liability] [at fault].

The comment k exception for unavoidably unsafe products continues to apply to a negligent design defect claim against a manufacturer even though not expressly provided for in the WPLA. The Washington Supreme Court in Ruiz-Guzman holds "[t]here is no debate" the comment k exception to the Restatement (Second) of Torts

25

section 402A "has been expressly adopted by this court." Ruiz-Guzman, 141 Wn.2d at 506 (citing Terhune, 90 Wn.2d at 9). The court states that although "the comment k exception to strict liability was not expressly provided for by the Legislature in adopting the WPLA, . . . it is implicit that products that are 'unavoidably unsafe' are not products that ever could be 'reasonably safe as designed.' " Ruiz-Guzman, 141 Wn.2d at 506[9] (quoting RCW 7.72.030(1)). The exception "recognize[s] the unique protection provided to the consumers of such products by the prescribing physician (and/or pharmacist) intermediary." Ruiz-Guzman, 141 Wn.2d at 508. Because an unavoidably unsafe product such as a medical device is incapable of being made completely safe, the court adopted a negligence standard for design defect claims involving comment k products. Ruiz-Guzman, 141 Wn.2d at 507-08.

Accordingly, the WPI for a design defect claim against a medical device manufacturer of an unavoidably unsafe product under comment k, WPI 110.02.01 (Comment K Negligence Instruction), makes clear that the standard is negligence and the focus is on the conduct of the manufacturer to use reasonable care to design a medical product that is reasonably safe. "Reasonable care is to be determined by what the manufacturer knew or reasonably should have known at the time of the plaintiff's injury." WPI 110.02.01, at 635. The Comment K Negligence Instruction states:

> A [pharmaceutical] [medical product] manufacturer has a duty to use reasonable care to design [drugs] [medical products] that are reasonably safe. "Reasonable care" means the care that a reasonably prudent [pharmaceutical] [medical product] manufacturer would exercise in the same or similar circumstances. A failure to use reasonable care is negligence.

---

[9] Italics omitted, emphasis in original.

26

The question of whether a manufacturer exercised reasonable care is to be determined by what the manufacturer knew or reasonably should have known at the time of the plaintiff's injury.

In determining what a manufacturer reasonably should have known in regard to designing its product, you should consider the following:

A [pharmaceutical] [medical product] manufacturer has a duty to use reasonable care to test, analyze, and inspect the products it sells, and is presumed to know what such tests would have revealed.

A [pharmaceutical] [medical product] manufacturer has a duty to use reasonable care to keep abreast of scientific knowledge, discoveries, advances, and research in the field, and is presumed to know what is imparted thereby.

Here, the court used Anderson's proposed Comment K Negligence Instruction to instruct the jury. Jury instruction 20 states:

As to the plaintiff's claim against the Medtronic Defendants, a medical device manufacturer has a duty to use reasonable care to design medical devices that are reasonably safe. "Reasonable care" means the care that a reasonably prudent medical device manufacturer would exercise in the same or similar circumstances. A failure to use reasonable care is negligence.
The question of whether a medical device manufacturer exercised reasonable care is to be determined by what the manufacturer knew or reasonably should have known at the time the device left its control.
In determining what a medical device manufacturer reasonably should have known in regard to designing its device, you should consider the following:
A medical device manufacturer has a duty to use reasonable care to test, analyze, and inspect the products it sells, and is presumed to know what such tests would have revealed.
A medical device manufacturer has a duty to use reasonable care to keep abreast of scientific knowledge, discoveries, advances, and research in the field, and is presumed to know what is imparted thereby.

But Anderson asserts the court erred in refusing to give her supplemental jury instruction on the risk utility and consumer expectations tests to define whether a medical device is reasonably safe. The proposed supplemental instruction deletes the clearly inapplicable language of the Strict Liability Instruction that states, "A

27

manufacturer has a duty to design products that are reasonably safe as designed," but otherwise sets forth verbatim the tests used in determining a strict liability design defect claim: the risk utility and consumer expectations tests.[10]

To prove a strict liability claim against a manufacturer, the WPLA and case law make clear the plaintiff can show the product is not reasonably safe two different ways: the risk utility and consumer expectations tests. Anderson claims that because the Comment K Negligence Instruction does not define "reasonably safe," the court must instruct the jury to use the risk utility and consumer expectations tests. We disagree.

Under the WPLA and case law, the risk utility and consumer expectations tests are used to determine whether a manufacturer is strictly liable and do not apply to a negligence design defect claim under comment k. And contrary to the assertion of Anderson, the Comment K Negligence Instruction addresses the factors the jury should consider in determining whether a medical device manufacturer used reasonable care

---

[10] Anderson's proposed supplemental jury instruction states:

There are two tests for determining whether a medical product is not reasonably safe as designed. The plaintiff may prove that the medical product was not reasonably safe using either of these two tests.

The first test is a balancing test. Under that test, you should determine whether, at the time the product was manufactured:

the likelihood that the product would cause injury or damage similar to that claimed by the plaintiff, and the seriousness of such injury or damage

outweighed

the burden on the manufacturer to design a product that would have prevented the injury or damage, and the adverse effect that a practical and feasible alternative design would have on the usefulness of the product.

The second test is whether the product is unsafe to an extent beyond that which would be contemplated by the ordinary health care provider user. In determining what an ordinary health care provider user would reasonably expect, you should consider the following:

    a.    The relative cost of the product;
    b.    The seriousness of the potential harm from the claimed defect;
    c.    The cost and feasibility of eliminating or minimizing the risk; and
    d.    Such [other] factors as the nature of the product and the claimed defect indicate are appropriate.

to design a medical device that is reasonably safe. Specifically, "[i]n determining what a medical device manufacturer reasonably should have known in regard to designing its device," the jury must consider:

A medical device manufacturer has a duty to use reasonable care to test, analyze, and inspect the products it sells, and is presumed to know what such tests would have revealed.
A medical device manufacturer has a duty to use reasonable care to keep abreast of scientific knowledge, discoveries, advances, and research in the field, and is presumed to know what is imparted thereby.

The court did not err in refusing to give the supplemental jury instruction. The instruction the court gave to the jury correctly describes the duty of a manufacturer of unavoidably unsafe products in designing reasonably safe medical devices under comment k of the Restatement (Second) of Torts section 402A.

Costs Award under RCW 4.84.010

Anderson also contends the court erred by awarding Medtronic the cost of eight depositions. Anderson asserts Medtronic did not show that the depositions used at trial were "necessary to achieve the successful result." RCW 4.84.010(7). Anderson also argues Medtronic did not establish the pro rata cost for depositions used at trial under RCW 4.84.010(7). Anderson argued the costs of the depositions should be "disallowed in total."

We review an award of costs for abuse of discretion. In re Discipline of VanDerbeek, 153 Wn.2d 64, 99, 101 P.3d 88 (2004). Under RCW 4.84.010(7), a prevailing party is entitled to the costs of taking depositions if the depositions were taken and used at trial as substantive evidence or for impeachment purposes. Kiewit-

29

Grice v. State, 77 Wn. App. 867, 874, 895 P.2d 6 (1995); Andrews v. Burke, 55 Wn. App. 622, 630-31, 779 P.2d 740 (1989). RCW 4.84.010 states, in pertinent part:

> The measure and mode of compensation of attorneys and counselors, shall be left to the agreement, expressed or implied, of the parties, but there shall be allowed to the prevailing party upon the judgment certain sums for the prevailing party's expenses in the action, which allowances are termed costs, including, in addition to costs otherwise authorized by law, the following expenses:
>
> . . . .
>
> (7) To the extent that the court or arbitrator finds that it was necessary to achieve the successful result, the reasonable expense of the transcription of depositions used at trial or at the mandatory arbitration hearing: PROVIDED, That the expenses of depositions shall be allowed on a pro rata basis for those portions of the depositions introduced into evidence or used for purposes of impeachment.

In addition, "[a] party that prevails on a summary judgment motion may recover costs 'incurred in taking depositions specifically considered by the trial court.' " Estep v. Hamilton, 148 Wn. App. 246, 260, 201 P.3d 331 (2008) (quoting Herried v. Pierce County Pub. Transp. Benefit Auth. Corp., 90 Wn. App. 468, 476, 957 P.2d 767 (1998)). If only a portion of the deposition transcript was used, the prevailing party can recover for that portion on a pro rata basis. RCW 4.84.010(7).

The record supports the award of costs for the eight depositions. Two of the videotaped depositions, the deposition of Dr. Paugh and Scott Van Doren, were played in their entirety at trial. The record shows the other depositions were used at trial during cross-examination and for impeachment purposes. Further, in its order granting Medtronic's motion for summary judgment on the failure to warn claim, the court states it considered the depositions of Dr. Paugh, Dr. James Reibel, Dr. Barry Wenig, and

Scott Van Doren and both depositions of Dr. Samaras. The court did not abuse its discretion by awarding Medtronic the costs for the eight depositions.

We affirm the jury verdict.

WE CONCUR:

_____ COX, J.